# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-10-00673-CV
---

**Texas Board of Chiropractic Examiners, Glenn Parker, Executive Director, and Texas Chiropractic Association, Appellants**

**v.**

**Texas Medical Association, Texas Medical Board, and the State of Texas, Appellees**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-GN-06-003451, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING
---

## O P I N I O N

The Texas Board of Chiropractic Examiners (TBCE), its executive director, and the Texas Chiropractic Association appeal a final district court judgment invalidating portions of TBCE's recently adopted administrative rule defining the scope of practice of chiropractic. *See* 22 Tex. Admin. Code § 75.17 (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). The rule provisions at issue purport to authorize TBCE's licensees to perform procedures known as manipulation under anesthesia and needle electromyography, and to "diagnose" certain conditions. *See id.* § 75.17(a)(3), (c)(2)(D), (c)(3)(A), (d)(1)(A)-(B), (e)(2)(O). We will affirm the judgment in part and reverse and remand in part.

**BACKGROUND**

Article XVI, section 31 of the Texas Constitution authorizes the Legislature to "pass laws prescribing the qualifications of practitioners of medicine in this State," with the caveat that "no preference shall ever be given by law to any schools of medicine." Tex. Const. art. XVI, § 31. In turn, the Legislature has enacted the Medical Practice Act, in which it has delegated broad authority to the Texas Medical Board (TMB) to regulate the "practice of medicine" in this state, mandated that a person cannot lawfully "practice medicine" without a TMB-issued license, and imposed rigorous education and training requirements as a prerequisite to licensing eligibility. *See* Tex. Occ. Code Ann. §§ 151.001-.056 (West 2004 & Supp. 2011) (Medical Practice Act); *id.* §§ 151.003(2) (providing that TMB "should remain the primary means of licensing, regulating, and disciplining physicians."), 152.001(a) (West Supp. 2011) (designating TMB as agency with power to regulate the practice of medicine), 153.001(3) (West 2004) (granting TMB the authority to adopt rules to regulate the practice of medicine), 155.001 (West 2004) (requiring license to practice medicine), 155.003 (West Supp. 2011) (setting forth requirements for license to practice medicine). The Legislature has defined "practicing medicine" under the Medical Practice Act as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions" by a person who either "directly or indirectly charges money or other compensation for those services" or publicly professes to be a physician or surgeon. *See id.* § 151.002(a)(13).

However, the Legislature has carved out of this broad definition of "practicing medicine"—and, thus, exempted from the Medical Practice Act's education, training, and licensing standards and the TMB's regulatory authority—a variety of other health-related fields on which it

2

has imposed different legal requirements and regulations. *See id.* § 151.052. Such exemptions, our Texas high courts have reasoned, do not amount to an unconstitutional "preference . . . to any school[] of medicine" to the extent the exempted treatment or method does not extend to the "whole body." *See Schlichting v. Texas State Bd. of Med. Exam'rs*, 310 S.W.2d 557, 564 (Tex. 1958); *Ex parte Halsted*, 182 S.W.2d 479, 486 (Tex. Crim. App. 1944). Among the exemptions, the Legislature has included "a licensed chiropractor engaged strictly in the practice of chiropractic as defined by law." *See* Tex. Occ. Code Ann. § 151.052(a)(3). Chiropractors are currently regulated under chapter 201 of the occupations code, which defines the permissible scope of chiropractic practice, imposes its own set of educational and licensing requirements, and delegates authority to TBCE to administer the regime. *See id*. §§ 201.001-.606 (West 2004 & Supp. 2011).

The net effect of the statutory interplay is that a person licensed by TBCE as a chiropractor but not by the TMB to "practice medicine" (i.e., as a physician[1]) can lawfully do things that would otherwise constitute "practicing medicine" as long as he remains within the statutory scope of chiropractic under chapter 201. However, to the extent he exceeds the statutory scope of chiropractic, he would subject himself to the Medical Practice Act—and practice medicine unlawfully. *See id.* §§ 151.002(a)(13), 201.002;[2] *see also Teem v. State*, 183 S.W. 1144 (Tex. Crim. App. 1916) (involving prosecution of chiropractor for unlawfully practicing medicine prior to Texas's legislative recognition and legalization of chiropractic). Another consequence of this

---

[1] *See* Tex. Occ. Code Ann. § 151.002(a)(12) (West Supp. 2011) ("physician" refers to a licensee under the Medical Practice Act).

[2] Conversely, physicians do not subject themselves to chapter 201 if their conduct comes within the statutory scope of chiropractic. *See id.* § 201.003(b) (West 2004) (Chapter 201 "does not limit or affect the rights and powers of a physician licensed in this state to practice medicine.").

statutory interplay is a long history of professional, scientific, or economic antagonism between

chiropractors and the medical community, and resultant disputes, spanning all three branches of

government, regarding where any legal line between chiropractic and the practice of medicine is or

should be. Key participants in these disputes have included the two professional associations that

are parties to this appeal, the Texas Chiropractic Association (TCA) and the Texas Medical

Association (TMA), which advocate on behalf of the respective interests of chiropractors and

physicians and their sometimes-competing views of patient welfare.

Chiropractic was historically rooted in a theory that a wide range of human health

problems stem from spinal misalignment—or a broader category of spinal disorders termed

"subluxations"—and can be cured through manipulation of vertebrae.[3] At its 1949 inception,

Texas's statutory regime defining and regulating chiropractic reflected this traditional focus on

ascertaining spinal problems and manipulating vertebrae as an intended means of cure.[4] However,

---

[3] While different cultures throughout history have employed manipulation of human bones and tissue as an intended means of improving health, David D. Palmer is typically credited with originating the modern theory of chiropractic in 1895, when he reportedly restored a man's hearing by using spinal manipulation. *See* Walter I. Wardwell, *Chiropractic: History & Evolution of a New Profession* 2 (1992); Erland Pettman, *A History of Manipulative Therapy*, 15 The Journal of Manual & Manipulative Therapy 165, 165-66 (2007); Judith Turner, *Gale Encyclopedia of Medicine: Chiropractic* (2006). Palmer concluded that misalignment or "subluxations" in the spine created pressure on or irritation of nerves that, in turn, could lead to various health problems, disease, or disability. Wardwell at 2; Pettman at 168. Based on this theoretical premise, Palmer sought to develop a procedure for adjusting misaligned vertebrae as a means of improving health and, eventually, founded this country's first chiropractic school, the Palmer School of Cure in Davenport, Iowa, currently known as the Palmer College of Chiropractic. *See* Palmer College of Chiropractic, http://www.palmer.edu/History (last visited Mar. 13, 2011). While today's chiropractors typically recognize the importance of other factors in disease causation, they still manipulate spines to correct musculoskeletal problems. *See* Wardwell at 2.

[4] The 1949 enactment defined the practice of chiropractic as follows:

over the ensuing decades, Texas chiropractors evidently came to engage in identifying and treating a wider range of musculoskeletal problems with a wider range of procedures or methods. In 1989, the Legislature saw fit to take account of these developments through amendments to the statutory definition of chiropractic practice that expanded the focus of chiropractic beyond the spine to the more general "biomechanics" of the "musculoskeletal system," and added somewhat broader language regarding the treatments or methods chiropractors could perform. *See* Act of May 12, 1989, 71st Leg., R.S., ch. 227, §§ 1-3, 1989 Tex. Gen. Laws 1005, 1005-06.[5] Although procedures

---

> Any person shall be regarded as practicing chiropractic within the meaning of this Act who shall employ objective or subjective means without the use of drugs, surgery, X-ray therapy or radium therapy, for the purpose of ascertaining the alignment of the vertebrae of the human spine, and the practice of adjusting the vertebrae to correct any subluxation or misalignment thereof, and charge therefor, directly or indirectly, money or other compensation; or who shall hold himself out to the public as a chiropractor or shall use either the term "chiropractor," "chiropractic," "doctor of chiropractic," or any derivative of any of the above in connection with his name.

*See* Act of Apr. 21, 1949, 51st Leg., R.S., ch. 94, § 1, 1949 Tex. Gen. Laws 160, 160-61. The Texas Legislature first enacted a statute recognizing chiropractic and exempting it from the laws governing the practice of medicine in 1943. *See* Act of May 5, 1943, 48th Leg., R.S., ch. 359, §§ 1-17, 1943 Tex. Gen. Laws 627. The 1943 statute authorized chiropractors to treat the "spinal column, and its connecting tissues." *Id*. § 3, 1943 Tex. Gen. Laws at 628-29. The Court of Criminal Appeals later invalidated this law as an unconstitutional "preference" to chiropractic, reasoning that "the spinal column *and its connecting tissues* embraces the entire body and all organs thereof." *See Ex parte Halsted*, 182 S.W.2d 479, 486 (Tex. Crim. App. 1944) (emphasis added). The current statutory regime defining and regulating chiropractic traces back to the 1949 enactment.

[5] The amended definition provided:

A person shall be regarded as practicing chiropractic within the meaning of this Act if the person:

(1)     uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;

entailing "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material" were expressly excluded from the practice, chiropractors were now permitted to use (1) "objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body" and (2) "adjustment, manipulation, or other procedures in order to improve subluxation or the biomechanics of the musculoskeletal system." *See id.* §§ 1, 3, 1989 Tex. Gen. Laws at 1005-06.

In the aftermath of the 1989 amendments, a number of controversies arose concerning whether particular examination or treatment procedures exceeded the statutory scope of chiropractic and, relatedly, the extent to which TBCE, by permitting chiropractors to perform them, was abetting unlawful encroachments upon the practice of medicine. Areas of dispute included the extent to which chiropractors could perform procedures entailing the insertion of needles into the human body, such as acupuncture and a procedure known as needle electromyography, or "needle EMG." Simply described, needle EMG entails the insertion of needle electrodes into a patient's muscle and

---

(2)     uses adjustment, manipulation, or other procedures in order to improve subluxation or the biomechanics of the musculoskeletal system; or

(3)     holds himself out to the public as a chiropractor or uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms in connection with his name.

Act of May 12, 1989, 71st Leg., R.S., ch. 227, § 1, 1989 Tex. Gen. Laws 1005. Excluded from the scope of chiropractic practice, however, were the provision of "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material." *See id.* § 3, 1989 Tex. Gen. Laws at 1006. Amendment proponents evidently touted the changes as necessary to modernize the "outdated" statutory definition to "reflect the education, training, and clinical expertise of chiropractors today" and to account for a study showing that "86.8% of the conditions treated by chiropractors can be classified as musculoskeletal problems" rather than spinal misalignment. *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 169, 71st Leg., R.S. (1989).

transmitting a small electric current as a means of evaluating nerve conductivity. Another subject of controversy was a treatment method known as manipulation under anesthesia, or "MUA." As the term suggests, MUA entails a chiropractor's manipulation of the musculoskeletal system while the patient is under general anesthesia so as to facilitate a greater range of motion than if the patient was feeling pain or resisting.[6]

Against this backdrop, in 1995 the Legislature made several important amendments to the statutory scope of chiropractic. These included specifying that the treatment methods that defined the scope of chiropractic were "nonsurgical, nonincisive procedures, including but not limited to adjustment and manipulation, in order to improve the subluxation complex or the biomechanics of the musculoskeletal system," and likewise excluding "incisive or surgical procedures" from the scope of chiropractic practice. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 965, §§ 13, 18, 1995 Tex. Gen. Laws 4789, 4802-03 (current version at Tex. Occ. Code Ann. § 201.002(b)-(c)). The Legislature defined or described "incisive or surgical procedures" as follows:

> In this act, "incisive or surgical procedure" includes but is not limited to making an incision into any tissue, cavity or organ by any person or implement. It does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

*See id.* § 18, 1995 Tex. Gen. Laws at 4803. Additionally, the Legislature prohibited TBCE from "adopt[ing] a process to certify chiropractors to perform manipulation under anesthesia." *See id.* § 19, 1995 Tex. Gen. Laws at 4803. These provisions were later codified in sections 201.002 and 201.154 of the occupations code. *See* Tex. Occ. Code Ann. §§ 201.002(a)(3) ("'Incisive or surgical

---

[6] The anesthesia itself is evidently administered by a qualified health-care professional other than a chiropractor, including an anesthesiologist, a physician.

procedure' includes making an incision into any tissue, cavity or organ by any person or implement. The term does not include the use of a needle for the purpose of drawing blood for diagnostic testing."), .002(c) ("The practice of chiropractic does not include . . . incisive or surgical procedures."), .154 ("Notwithstanding any other provision of this chapter, the [TBCE] may not adopt a process to certify chiropractors to perform manipulation under anesthesia.").[7]

---

[7] TMA and TMB, in particular, place great emphasis on the legislative history of these amendments. Although versions of the changes had appeared in earlier bills considered by the Seventy-Fourth Legislature, the amendments' immediate origins were a House floor amendment that Representative Tom Uher proposed to add to a bill that had theretofore focused chiefly on rural health-care issues. Although containing the same limitation of treatment methods to "nonsurgical, nonincisive procedures" and exclusion of "incisive or surgical procedures" that ultimately appeared in the final, enacted version, Uher's amendment defined "incisive procedure" to "include[] entry into any tissue, cavity, or organ by any person or implement," subject to some broad exceptions:

> ["incisive procedure"] does not include examination of the ear, nose, and throat, drawing blood for the purposes of diagnostic testing, or acupuncture or needle EMG if the chiropractor is certified to perform acupuncture or needle EMG under . . . this Act.

Floor Amendment No. 9 to Tex. S.B. 673, at 2, 74th Leg., R.S. (May 22, 1995). Additionally, as the exceptions contemplated, other provisions of Uher's proposed amendment would have required TBCE to adopt procedures and standards for "certifying" chiropractors to perform needle EMG and acupuncture. *See id.* at 6. The amendment imposed a similar mandate requiring TBCE to adopt procedures to certify chiropractors to perform MUA. *See id.* at 5.

In response to Uher's proposed amendment, then-Representative (later Senator) Kyle Janek, a physician, proposed to amend Uher's amendment to, in relevant part, (1) delete the exceptions for needle EMG and acupuncture in Uher's definition or description of "incisive" procedures; (2) delete the mandate that TBCE adopt processes for certifying chiropractors to perform needle EMG and acupuncture; and (3) invert the mandate that TBCE "shall adopt" processes for certifying chiropractors to perform MUA into an explicit prohibition that TBCE "shall not" adopt processes to "certify" chiropractors to perform MUA. *See* Floor Amendment No. 12 to Tex. S.B. 673, 74th Leg., R.S. (May 22, 1995). During the debate on these amendments, Representative Janek expressed his opinion that "[t]his amendment would take out any ability by the chiropractors to put needles in people." Debate on S.B. 673 on the Floor of the House, 74th Leg., R.S. (May 22, 1995) (statement of Rep. Janek) (transcript available from Senate Staff Services). The House of Representatives ultimately adopted Uher's amendment with Janek's modifications and a few

In the aftermath of these changes to the statutory scope of chiropractic, TBCE issued what it styled as informal "statements" or "memoranda" advising its licensees of its view that the 1995 amendments had not rendered needle EMG, acupuncture, or MUA beyond the scope of chiropractic practice.[8] Meanwhile, the Attorney General issued opinions reasoning that, to the contrary, any procedure involving the insertion of a needle into the body (other than the excepted blood draw for diagnostic use) was "incisive" and thus excluded it from the scope of chiropractic.[9] Applying this reasoning, for example, the Attorney General opined that acupuncture was an "incisive" procedure and thus excluded from the scope of chiropractic.[10] Thereafter, the Legislature amended the statutory definition of acupuncture, which had previously been stated in terms of "the insertion of an acupuncture needle," *see* Act of May 30, 1993, 73d Leg., R.S, ch. 862, § 37, 1993 Tex. Gen. Laws 3374, 3400, to refer instead to "the *nonsurgical*, *nonincisive* insertion of an acupuncture needle." *See* Act of May 28, 1997, 75th Leg., R.S., ch. 1170, § 1, 1997 Tex. Gen. Laws 4418 (emphasis added) (current version at Tex. Occ. Code Ann. § 205.001(2)(A) (West Supp. 2011)); *see also* Tex. Att'y Gen. Op. No. DM-471 (1998) (concluding that the 1997 amendment served to ensure that the practice of acupuncture would be within the practice of chiropractic, thereby

---

additional, less sweeping changes and refinements. *See* Floor Amendment Nos. 9-14 to Tex. S.B. 673 (May 22-24, 1995). These changes, in turn, were ultimately enacted into law, as described above.

[8] *See* Tex. Bd. of Chiropractic Exam'rs, *Acupuncture, MUA, and Needle EMG* (ratified September 11, 1997, amended May 7, 1998, and May 1999); Tex. Bd. Chiropractic Exam'rs, *RE: Scope of Practice Clarification regarding Nerve Conduction Studies* (Jan. 25, 2002) (memo to all Texas chiropractic licensees).

[9] *See, e.g.*, Tex. Att'y Gen. Op. No. DM-472, at 3 (1998).

[10] *See* Tex. Att'y Gen. Op. No. DM-415, at 4-6 (1996).

superseding the prior opinion). But the broader underlying disagreement concerning the use of needles in chiropractic remained,[11] as did the controversy regarding whether chiropractors could perform MUA. However, due in part to the advisory nature of the administrative pronouncements and related jurisdictional and procedural limitations, the controversies eluded judicial resolution for several years.[12]

The Legislature returned to chiropractic scope-of-practice issues in 2005 when TBCE came up for sunset review. Although it did not address either needle EMG or MUA through statutory amendments expressly mentioning either procedure, the Legislature did add a new description of the "surgical procedures" that were excluded from chiropractic:

> "Surgical procedure" includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

---

[11] *See* Tex. Att'y Gen. Op. No. DM-472, at 6 (concluding that "the use of a needle . . . for any purpose other than the drawing of blood for diagnostic purposes or the practice of acupuncture is not within the scope of practice of a licensed Texas chiropractor.").

[12] *See O'Neal v. Texas Bd. of Chiropractic Exam'rs*, No. 03-03-00270-CV, 2004 Tex. App. LEXIS 8254, at *9 (Tex. App.—Austin Sept. 10, 2004, no pet.) (mem. op.) (holding that suit by chiropractor against TBCE seeking declaration that needle EMG was within the scope of chiropractic practice did not present a justiciable controversy "where the . . . Board indisputably agrees with the legal interpretation . . . that [the chiropractor] seeks" and there was no more than speculation that it would change that view; also observing that Attorney General opinions did not in themselves present a justiciable controversy); *Continental Cas. Co. v. Texas Bd. of Chiropractic Exam'rs*, No. 03-00-00513-CV, 2001 Tex. App. LEXIS 2336, at * 2 (Tex. App.—Austin Apr. 12, 2001, no pet.) (mem. op., not designated for publication) (holding court lacked jurisdiction to hear insurance company's claim that TBCE improperly authorized chiropractors to perform MUA and needle EMG because there was no justiciable controversy where company was not a licensee or otherwise subject to TBCE); *see also Texas Mut. Ins. Co. v. Stelzer*, No. 03-06-00675-CV, 2010 Tex. App. LEXIS 236, *2-10 (Tex. App.—Austin 2010, no pet.) (mem. op.) (rejecting carrier's challenge to workers' compensation division order requiring reimbursement of chiropractor for needle-EMG procedure; holding that division properly deferred to TBCE interpretation of statutory scope of practice and that underlying scope-of-practice dispute was not properly before the court).

10

*See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 1, 2005 Tex. Gen. Laws 3464, 3465 (codified at Tex. Occ. Code Ann. § 201.002(a)(4)). The Legislature also mandated that TBCE "adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope," including "clearly specify[ing] the procedures that chiropractors may perform" and "any equipment and the use of that equipment that is prohibited." *See id*. § 8, 2005 Tex. Gen. Laws at 3466 (codified at Tex. Occ. Code Ann. §§ 201.1525-.1526). Among other implications, this rule-making mandate ensured that TBCE would issue scope-of-practice directives to its licensees in a form that opponents could test in court to determine whether they exceeded the underlying statutory scope of chiropractic. *See* Tex. Gov't Code Ann. § 2001.038 (West 2008) (creating cause of action for declaratory relief regarding "the validity or applicability of a rule" where "it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"); *see also Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 718 n.1 (Tex. App.—Austin 2008, pet. denied) (recognizing physician's standing to challenge validity of podiatric board rule that included ankle within the definition of "foot" and ultimately holding that rule exceeded board's rule-making authority).[13]

In response to this rule-making mandate, TBCE promulgated a "Scope of Practice" rule authorizing chiropractors to perform both needle EMG and MUA. *See* 22 Tex. Admin. Code

---

[13] In fact, one of the Sunset recommendations preceding the 2005 amendments had criticized TBCE's "practice of issuing Board opinions" to define the scope of chiropractic and recommended that the agency be required to promulgate administrative rules instead. *See* Sunset Advisory Comm'n, Sunset Comm'n Decisions: Tex. Bd. of Chiropractic Exam'rs (May 2004) at 3; Sunset Advisory Comm'n: Tex. Bd. of Chiropractic Exam'rs, Staff Report, at 5 (Feb. 2004).

§ 75.17.[14]  Invoking section 2001.038 of the Administrative Procedures Act, TMA sued TBCE[15]

seeking declarations that various provisions of the scope-of-practice rule that permitted needle EMG

and MUA were invalid because they exceeded the statutory scope of chiropractic and, therefore,

constituted the unlawful practice of medicine.[16]  TMA also asserted similar claims concerning a

provision of the rule permitting chiropractors to "diagnose" certain conditions.  In the alternative,

if any of the challenged rule provisions proved to be within TBCE's statutory authority, TMA sought

declarations that the underlying statutes granted chiropractors a "preference" over physicians in

practicing "medicine" in violation of article XVI, section 31 of the Texas Constitution.  TMA further

sought injunctive relief barring enforcement of the challenged rules or, alternatively, statutes.

On petition of TMA, the TMB was joined in the suit as a plaintiff.  After TBCE was

unsuccessful in challenging TMA's standing, TCA intervened as a defendant and also asserted its

---

[14] When it initially promulgated the scope-of-practice rule in 2006, TBCE purported to leave MUA unaddressed pending further rule-making while also emphasizing in the rule's preamble that MUA "ha[d] been part of the practice of chiropractic in Texas for more than 25 years" and that the agency was leaving this "status quo" undisturbed. *See* 31 Tex. Reg. 4613 (2006) (proposed Dec. 16, 2005), *amended in part by* 34 Tex. Reg. 4331 (2009) (proposed Jan. 2, 2009) (former 22 Tex. Admin. Code § 75.17).  This former version of the rule was the subject of the interlocutory jurisdictional appeal we addressed in *Texas Board of Chiropractic Examiners v. Texas Medical Association*, 270 S.W.3d 777, 780-83 (Tex. App.—Austin 2008, no pet.).  During the pendency of the litigation, TBCE amended the text of the rule to include an explicit authorization for chiropractors to perform MUA, discussed above. *See* 34 Tex. Reg. 4331 (2009) (codified at 22 Tex. Admin. Code § 75.17) (proposed Jan. 2, 2009).

[15] TMA also named TBCE's executive director as a defendant, and he appears in his official capacity as a party to this appeal.  Because any distinction between the two parties is not material to this appeal, for convenience we will use "TBCE" hereinafter to refer both to the agency itself and the agency and executive director collectively.

[16] TMA also sought a declaration that TBCE had failed to provide an adequate "reasoned justification" for the challenged rules, as required by the Administrative Procedure Act.  These claims are not at issue on appeal.

own affirmative claims for declarations that each of the challenged rules were within the statutory scope of chiropractic. In the alternative, TCA sought a declaration that a statutory definition of "surgical" added by the Legislature in the 2005 Sunset legislation was unconstitutional on grounds that included improper delegation of legislative authority to a private entity. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 465-75 (Tex. 1997).

TMA, joined by TMB (hereafter, the "Physician Parties"), sought traditional partial summary judgment on their claims seeking to invalidate, as beyond the statutory scope of chiropractic, TBCE's rules authorizing chiropractors to perform needle EMG and MUA. The district court granted the motion as to these claims.

In the same motion, the Physician Parties similarly sought summary judgment invalidating TBCE's rule permitting chiropractors to make "diagnoses" as beyond the statutory scope of chiropractic. TBCE and TCA (hereafter the "Chiropractor Parties") countered with a cross-motion for partial summary judgment dismissing the Physician Parties' claims challenging whether TBCE's rules permitting "diagnoses" were within the statutory scope of chiropractic.[17] The district court denied the Physician Parties' motion and granted the Chiropractor Parties' motion in part "as to the Chiropractic Board's use of the word 'diagnosis' in its rule." "However," the court emphasized, it "reserve[d] judgment regarding 'diagnosis' as it related to *scope of practice*." (Emphasis in original.) Following a second round of summary-judgment filings, however, the

---

[17] The district court's final judgment also references cross-motions purportedly filed by the Chiropractor Parties concerning the needle-EMG and MUA issues. However, no such motions appear in the appellate record, nor does the docket sheet reflect that any such motions were ever filed.

district court granted summary judgment for the Physician Parties as to a narrower portion of the "diagnosis" rule than they had challenged previously.

In the meantime, the Attorney General had intervened on behalf of the State of Texas to defend against each side's alternative constitutional claims, *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (West 2008), and the Attorney General and various other parties had filed pleadings attacking those claims. After the district court indicated its intended disposition of the second round of partial summary-judgment motions, but before it signed an order, TCA non-suited its affirmative claims for relief.

In light of TCA's non-suit, and concluding that the Physician Parties' "constitutional challenges" had been rendered "moot" by its summary-judgment rulings, the district court rendered a final judgment incorporating its summary-judgment rulings and declaring the aforementioned rule provisions concerning needle EMG, MUA, and "diagnoses" "invalid and void." Both of the Chiropractor Parties filed notices of appeal.

## ANALYSIS

In five issues on appeal, TCA challenges the district court's judgment invalidating TBCE rules regarding needle EMG, MUA, and "diagnoses." TBCE brings three issues challenging only the portions of the judgment invalidating the needle-EMG and MUA rules.

**Standard of review**

The challenged portions of the district court's judgment are predicated on its rulings granting or denying motions for partial summary judgment. We review the district court's summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident*

14

*Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and determine all questions presented and preserved. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We "should render the judgment that the trial court should have rendered." *Id.*

In this case, the parties' respective entitlements to summary judgment turn principally on whether the rules in question were within TBCE's statutory authority to adopt. To resolve such questions, we consider whether each rule: (1) contravened specific statutory language; (2) ran counter to the general objectives of the underlying statute, chapter 201 of the occupations code; or (3) imposed additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See City of Garland v. Public Util. Comm'n*, 165 S.W.3d 814, 819 (Tex. App.—Austin 2005, pet. denied).

Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437

15

(Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired; otherwise we construe the words according to their plain and common meaning unless a contrary intent is apparent from the context. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," *see* Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," "consequences of a particular construction," and the enactment's "title," *id*. § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is ambiguous—i.e., susceptible to more than one reasonable interpretation—"do we 'resort to rules of construction or extrinsic aids.'" *See Entergy Gulf States, Inc*., 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

As the Chiropractor Parties emphasize, in certain circumstances courts may be required to defer to an administrative agency's construction of its own statutory authority. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624-25

(Tex. 2011). But these principles apply only where the statute in question is ambiguous and only to the extent that the agency's interpretation is one of those reasonable interpretations. *See id.* "Consequently, to determine whether this rule of deference applies, a reviewing court must first make a threshold determination that the statute is ambiguous and the agency's construction is reasonable—questions that turn on statutory construction and are reviewed de novo." *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 800 (Tex. App.—Austin 2011, pet. filed) (citing *Texas Citizens*, 336 S.W.3d at 625). Additionally, this Court has recognized that these principles of deference may be subject to further qualifications where the subject matter is not within any specialized expertise of the agency, *see id.* (citing *Texas Citizens*, 336 S.W.3d at 630), and where "a nontechnical question of law" is involved, *see Rogers v. Texas Bd. of Architectural Exam'rs*, No. 03-10-00182-CV, 2011 Tex. App. LEXIS 6110, at * 15 (Tex. App.—Austin 2011, no pet. h.) (citing *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.)).

To the extent our analysis turns on administrative construction of the rules themselves, we defer to an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Tennessee Gas Pipeline Co. v. Rylander*, 80 S.W.3d 200, 203 (Tex. App.—Austin 2002, pet. denied). We construe administrative rules in the same manner as statutes because they have the force and effect of statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999).

**Needle EMG**

TCA's second issue and TBCE's first two issues challenge the district court's summary judgment invalidating rules relating to needle EMG.

As previously noted, the statutory scope of chiropractic practice includes "using objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body," *see* Tex. Occ. Code Ann. § 201.002(b)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(A) (tracking the same language in TBCE's scope-of-practice rule), but excludes any "incisive or surgical procedure," *see* Tex. Occ. Code Ann. § 201.002(c)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(2)(A), (c)(4), (d)(2), (e)(3) (tracking same exclusion in scope-of-practice rule), a term that:

> includes making an incision into any tissue, cavity, or organ by any person or implement . . . .
>
> [but] does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

Tex. Occ. Code Ann. § 201.002(a)(3) (formatting altered for emphasis).

In its scope-of-practice rule, TBCE construed and defined the term "incision"—i.e., that which characterizes an "incisive procedure"—as "[a] cut or a surgical wound; also, a division of the soft parts made with a knife or hot laser." 22 Tex. Admin. Code § 75.17(b)(3). TBCE further determined that the insertion of a needle into the human body might or might not "cut" the body or be "incisive" in the sense of the exclusion, or be "surgical," and promulgated a standard, found in subparagraph (a)(3) of the rule, for distinguishing "incisive" or "surgical" needle insertions from non-incisive and non-surgical ones:

18

(3)     Needles may be used in the practice of chiropractic under standards set forth by the [TBCE] but may not be used for procedures that are incisive or surgical.

    (A)     The use of a needle for a procedure is incisive if the procedure results in the removal of tissue other than for the purpose of drawing blood.

    (B)     The use of a needle for a procedure is surgical if the procedure is listed in the surgical section of the CPT Codebook.

*Id.* § 75.17(a)(3). The "CPT Codebook" is defined elsewhere in the rule as "the American Medical Association's annual Current Procedural Terminology Codebook (2004) . . . . adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services as Level I of the common procedure coding system." *See id.* § 75.17(b)(2).

Applying this standard, TBCE concluded that needle EMG was neither an "incisive" nor "surgical" procedure and, thus, was not excluded from the scope of chiropractic practice. Premised on that conclusion, TBCE promulgated two additional rule provisions addressing needle EMG specifically. The first, paragraph (c)(2)(D), listed "electro-diagnostic testing" among several examples of testing and measurement procedures that chiropractic licensees were permitted to use in evaluating or examining patients. *See id.* § 75.17(c)(2)(D). In the second provision, paragraph (c)(3)(A), TBCE imposed certification and supervision requirements on any licensees who administered "electro-neuro diagnostic testing" that varied according to whether the testing was "surface (non-needle)" or involved the use of needles. *See id.* § 75.17(c)(3)(A). The import or effect of paragraphs (c)(2)(D) and (c)(3)(A), as the parties agree, was that chiropractors with specified training and certification could utilize needle EMG in evaluating or examining patients.

19

In their live petition and summary-judgment motions, the Physician Parties challenged the validity of the two rule provisions specifically addressing needle EMG—75.17(c)(2)(D) and (c)(3)(A)—plus the general standard regarding use of needles—75.17(a)(3)—based on the assertions that each rule permitted chiropractors to perform needle EMG, and needle EMG was an "incisive" procedure excluded from the statutory scope of chiropractic. The district court granted the motions and rendered judgment declaring that "22 Tex. Admin. Code §§ 75.17(a)(3), 75.17(c)(2)(D) and 75.17(c)(3)(A), concerning needle electromyography, are . . . invalid and void." The Physician Parties did not challenge, and the district court did not invalidate, TBCE's definition of "incision" as a "cut," "surgical wound," or "division of the soft parts." *See id.* § 75.17(b)(3).

In holding that the three rules improperly permitted chiropractors to perform an "incisive" procedure, the district court, the Chiropractor Parties assert, misconstrued unambiguous statutory language or at least erred in failing to give required deference to TBCE's reasonable construction of ambiguous language. They concede that the last sentence of occupations code section 201.002(a)(3)—"[an incisive or surgical procedure] does not include the use of a needle for the purpose of drawing blood for diagnostic testing"—negatively implies that the use of a needle to draw blood for diagnostic testing would otherwise have been considered an "incisive" procedure in the view of the Legislature, as otherwise the exception created in that sentence would have amounted to a redundant nullity. *See DeQueen*, 325 S.W.3d at 638 ("Courts 'do not lightly presume that the Legislature may have done a useless act.'" (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex. 1998)); *Sultan v. Mathew*, 178 S.W.3d 747, 751 (Tex. 2005) ("We must avoid, when possible, treating statutory language as surplusage."). But the fact that this procedure involving use of a needle would be considered "incisive," the Chiropractor Parties

20

insist, does not imply that *every* procedure involving the insertion of a needle into the human body necessarily is. They urge that any such construction or inference ignores the Legislature's 1997 amendments to the statutory definition of acupuncture. In those amendments, as previously explained, the Legislature, with evident reference to its prior exclusion of "incisive" and "surgical" procedures from the practice of chiropractic, changed the definition of acupuncture to refer to "the nonsurgical, nonincisive insertion of an acupuncture needle . . . to specific areas of the human body." *See* Act of May 28, 1997, § 1, 1997 Tex. Gen. Laws at 4418 (codified at Tex. Occ. Code Ann. § 205.001(2)(A)); Tex. Att'y Gen. Op. No. DM-471 (1998) (observing that 1997 amendment responded to prior opinion concluding that acupuncture was an "incisive" procedure outside the scope of chiropractic). By expressly contemplating, in a related statute, that the insertion of a needle into the human body may be "nonincisive" (not to mention "nonsurgical"), the Legislature, in the Chiropractor Parties' view, confirmed that needle insertions may either be "incisive" or "nonincisive" within the meaning of the statutory exclusion from chiropractic. And it follows, they add, that the mere fact a needle insertion creates some degree of hole or separation of tissue along the length of the inserted instrument, as all needle insertions will, cannot in itself be the criterion that distinguishes an "incisive" needle insertion from a "nonincisive" one within the Legislature's contemplation.

The Chiropractor Parties add that TBCE's standard for distinguishing "incisive" from "nonincisive" needle use, which focuses on whether the procedure results in the removal of tissue, *see* 22 Tex. Admin. Code § 75.17(a)(3), is consistent with this statutory framework. They reason that (1) if using needles for blood draws for diagnostic use is an "incisive" procedure (again, the negative implication of the Legislature's exception of blood draws from "incisive or surgical"

21

procedures, *see* Tex. Occ. Code Ann. § 201.002(a)(3)), (2) but needle insertion in itself cannot be what makes the procedure "incisive" (as implied by the statutory definition of acupuncture as entailing "nonincisive" needle insertion into the body, *see* Tex. Occ. Code Ann. § 205.001(2)(A)), (3) then the "incisive" character of a needle blood draw must relate to the fact that it results in the separation and removal of the blood itself or, more generally, tissue, as blood is considered to be a form of connective tissue. That distinguishing feature, the Chiropractor Parties assert, is properly reflected in TBCE's standard for determining "incisive" needle use. In striking down that standard, they argue, the district court overlooked the unambiguous text of the relevant statutes, or at least failed to give required deference to TBCE's reasonable construction of ambiguous text. And the same error, they add, led the district court to improperly strike down the two rules permitting needle EMG, as it is undisputed that the procedure does not entail the removal of tissue.

The Physician Parties' core contention in response, as it was in their summary-judgment motions, is that occupations code section 201.002(a)(3)'s express exception for needle blood draws for diagnostic purposes from the "incisive or surgical" procedures excluded from chiropractic reflects the Legislature's intent that all other procedures involving needle usage, including needle EMG, be excluded from the scope of chiropractic practice. Such a construction, they reason, is necessary both to give effect to the exclusion, *see Liberty Mut. Ins. Co. v. American Emp'rs Ins. Co.*, 556 S.W.2d 242, 245 (Tex. 1977) (in context of construing a contract, observing "the purpose of an exclusion is to take something out . . . that would otherwise have been included in it"), and by the canon of statutory construction known as *expressio unius est exclusio alterius*—literally "the specific mention of one is the exclusion of the other"—under which we would presume that the Legislature's explicit mention or inclusion of one thing signals its intention

22

to exclude the other or the alternative thing. *See Johnson v. Second Injury Fund*, 688 S.W.2d 107, 108-09 (Tex. 1985) (citing *Bryan v. Sundberg*, 5 Tex. 418, 422-23 (Tex. 1849)). They similarly rely on the more general principle that courts must assume that the Legislature chose its words carefully and deliberately, and included or excluded particular words purposefully. *See, e.g.*, *DeQueen*, 325 S.W.3d at 635; *USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied).

In further support, the Physician Parties emphasize the legislative history of the 1995 amendments that added the exclusion and description of "incisive or surgical procedures." In their view, this history confirms the Legislature's intent to forbid chiropractors from performing needle EMG and any other procedure entailing the insertion of needles into the human body. In reply, the Chiropractor Parties remind us that statutory construction turns not on the statements of individual legislators but on the text of the statutes the Legislature collectively enacts. *See Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 435 (Tex. 2011) (noting that courts should apply "text-centric model" when construing statutes, using extrinsic aids such as legislative history only when text is not clear). And that statutory text, they urge, stops well short of evidencing intent to outlaw needle EMG by chiropractors, especially considering that the procedure has been performed by Texas chiropractors since the early 1990s and been a frequent concern of the medical community for much of that time. If the Legislature had truly meant to prohibit chiropractors from performing needle EMG, they suggest, it presumably would have said so more clearly and directly instead of condemning "incisive" procedures and delegating power to TBCE to promulgate scope-of-practice rules.

As for the implications of the acupuncture statute's reference to "nonsurgical, nonincisive" needle insertions, the Physician Parties first suggest that this language is simply irrelevant because chiropractors acting within the scope of their license are exempted from the acupuncture statutes.[18] They similarly question the premise of the Chiropractor Parties (and the Attorney General)[19] that the definition of acupuncture as "nonsurgical" and "nonincisive" under the statutes regulating its practice necessarily resolves whether or not it is "incisive" under the meaning of the chiropractic statutes. However, the Physician Parties have also relied on the narrower point (so to speak) that the types of needles used in needle EMG have physical features that materially distinguish them from those used in acupuncture.

In support of their summary-judgment motion, TMA presented the affidavit of Dr. Sara G. Austin, a physician, who compared the characteristics of acupuncture needles versus those used in needle EMG. Attached to her affidavit were photographs comparing what she averred were "a standard needle used in performing acupuncture" alongside "two of the types of needles I use in performing EMG." The photographs reflected that the two needle-EMG needles were longer and somewhat thicker than the acupuncture needle, with one of the needle-EMG needles appearing to extend four or five times the length of the acupuncture needle.[20] Austin further testified that the

---

[18]  *See* Tex. Occ. Code Ann. § 205.003 (West 2004) (government code chapter 205, the chapter regulating acupuncture, "does not apply to a health care professional licensed under another statute and acting within the scope of the license").

[19]  *See* Tex. Att'y Gen. Op. No. DM-471 (1998); Tex. Att'y Gen. Op. No. DM-472 (1998).

[20]  The photographic depictions show the acupuncture needle as approximately three-quarters to one inch long, one of the needle-EMG needles appears to be roughly one-and-a-half inches long, and the remaining needle-EMG needle is approximately four or five inches long. However, Austin indicated that while the photographs accurately depicted the needles' comparative sizes, shapes, and configurations, the "photocopying process" had created some differences from their actual sizes.

24

tips of the types of needles used in needle EMG "typically are beveled"—i.e., have an angled side or end, characteristic of a blade or cutting edge[21]—and, consequently, "incise tissue" (in the sense of cutting it like a blade) when they are inserted during the EMG examination.[22] She did not, however, speak directly to the types of tips found on acupuncture needles.

The Physician Parties portray this summary-judgment evidence as establishing conclusively that needle-EMG needles characteristically have a beveled or cutting edge. Consequently, they reason, the insertion of such a needle into the human body effects a "cut" or "incision" and, thus, is an "incisive procedure" within the meaning of the statutory exclusion. In reply, the Chiropractor Parties emphasize Dr. Austin's deposition testimony, which they presented with their summary-judgment response. During her deposition, Austin acknowledged that while she used needle-EMG needles that have a beveled, blade-like edge, some other practitioners performing the procedure instead used needles having a tapered or blunt edge.

Our analysis of the parties' competing contentions begins, in the first instance, with a threshold question of whether the Legislature intended the term "incisive" procedure as used in the statutory exclusion to be afforded its ordinary meaning or a somewhat narrower technical meaning. *See City of Rockwall*, 246 S.W.3d at 625-26. Especially in the context of health care, "incisive" is used to refer to the act of cutting, usually tissue. *See Stedman's Medical Dictionary* 700

---

[21] Austin also referenced an attached magnified image of a needle tip showing such an edge.

[22] Austin did not purport to opine as to whether the needle would be "incisive" in the sense that term is used in the statutory exclusion. To the extent her testimony might be so construed, we note that the testimony would amount to an incompetent legal conclusion. *See LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 689 (Tex. 2006) (holding that bare legal conclusion is not competent summary-judgment evidence); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (observing that unsupported legal conclusions are not competent evidence and may not support a judgment even in the absence of an objection).

25

(5th Unabridged Lawyers' ed. 1982) (defining "incisive" as "cutting; having the power to cut");

*Dorland's Illustrated Medical Dictionary* 940 (31st ed. 2007) (defining "incisive" as "having the power or quality of cutting," and listing under its heading for "incision" various types of medical tissue incisions). By contrast, the ordinary meaning of "incisive" embraces not only the concept of cutting, but also "piercing" ("run[ning] into or through as a pointed instrument . . . does, stab[bing] . . .[,] mak[ing] a hole in or through") and "penetrating" ("pass[ing] into or through").[23] A needle insertion into the human body would quite obviously satisfy the ordinary meaning of "incisive," as such a procedure would plainly "penetrate" tissue, if not also "pierce" it. But it is a closer question whether a needle insertion likewise "cuts" tissue and meets the narrower, technical definition.

In this case, our choice between the ordinary and technical meaning of "incisive" has been narrowed somewhat by TBCE's rule provision, unchallenged by the Physician Parties and undisturbed by the district court's judgment, construing the related term "incision." *See* Tex. Occ. Code Ann. § 201.002(c) (providing that "'[i]ncisive or surgical procedure' includes making an *incision* into any tissue, cavity, or organ by any person or implement . . . ) (emphasis added). Consistent with the technical meaning of "incisive," TBCE has defined "incision" to mean, in relevant part, "a cut or surgical wound." *See* 22 Tex. Admin. Code § 75.17(b)(3). Consequently, whether the use of a needle is "incisive" so as to be excluded from chiropractic turns on whether such use "cuts" or makes a "surgical wound" "into any tissue, cavity, or organ." And, in light of this

---

[23] *See Webster's Third New Int'l Dictionary* 1142 (defining "incisive" as "having a cutting edge or a piercing point"), 1670 (defining "penetrate"), 1712 (defining "pierce") (2002); *American Heritage College Dictionary* 687 (defining "incisive" as penetrating), 1010 (defining "penetrate" as "to enter or force a way into; pierce"), 1035 (defining "pierce" as "to cut or pass through with or as if with a sharp instrument; stab or penetrate") (2000).

rule definition, our analytical focus must shift to determining whether the three invalidated rules permitting needle EMG are premised on a construction and application of "cut" that is clearly erroneous or inconsistent with the rule's text and underlying statutes. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 435, 438 (Tex. 2011) ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."); *Rodriguez*, 997 S.W.2d at 254 ("While we defer to the Commission's interpretation of its own regulation, we cannot defer to an administrative interpretation that is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Gulf State Utils. Co.*, 809 S.W.2d at 207)).

Here the summary-judgment evidence becomes relevant to our analysis. Although the summary-judgment evidence falls short of establishing conclusively that *all* needle-EMG needles have a beveled, blade-like edge, Dr. Austin's testimony remains undisputed that at least *some* of the types of needles used by practitioners in performing that procedure do have that feature. And the very purpose of having such an edge on a needle, as Austin further explained, is to make the needle cut or slice through tissue, like a blade or knife. This evidence conclusively establishes that at least some types of needles used in needle EMG "cut" into tissue under any conceivable definition of that term. In its ordinary usage, "cut" with reference to something being inserted into or applied to tissue means "to penetrate with or as if an edged instrument" or to separate into parts with a sharp instrument. *See Webster's Third New Int'l Dictionary* 560 (2002) (defining "cut" as "to penetrate with or as if with an edged instrument . . . . make an incision in . . . . to separate into parts"); *American Heritage College Dictionary* 341 (2000) (defining "cut" as "to penetrate with a sharp edge; . . . . [t]o separate into parts with or as if with a sharp-edged instrument; sever"); *Random House*

27

*Dictionary of the English Language* 494 (2d ed. 1987) (defining "cut" as "to penetrate with or as if with a sharp-edged instrument or object . . . to divide with or as if with a sharp-edged instrument or object"). We also observe that in the context of health care, needles with beveled edges are said to "cut" or have a "cutting edge," as contrasted with differently edged needles that do not "cut." *Compare Dorland's* at 1255 (defining "cope needle" as "blunt-ended hook like needle with a concealed cutting edge and snare" *and* "Hagedorn's needles" as "surgical needles that are flat from side to side with a straight, cutting edge near the point") *with id*. (defining "spatula needle" as "minute needle with a flat or slightly curved concave surface that does not cut or pierce"). Further, while the question of whether acupuncture is within the chiropractic scope of practice is not before us, nor does the summary-judgment evidence address whether or not acupuncture needles have a beveled edge, this distinction between beveled, "cutting" needles and other kinds that do not "cut" would perhaps explain how, in the Legislature's view, acupuncture needles would be capable of being inserted into the body in a "nonincisive" and "nonsurgical" manner. *See* Tex. Occ. Code Ann. § 205.001(2)(A).

In contending that needle EMG is not a "cutting" or "incisive" procedure, the Chiropractor Parties ultimately rely upon an asserted distinction predicated on the size of a needle's cutting edge as compared to that of scalpels, knives, or other larger cutting instruments. As they explain their position on appeal, "[a] 'cut' or 'wound' involves an appreciable separation of tissue in at least two directions, as when a knife cuts into and along the body at the same time," (citing dictionary definition of "cut" as "an opening made with an edged instrument"), "[b]ut a needle entry typically creates an appreciable separation of tissue in only one direction—along the length of the needle—because the width of most needles is small." Consequently, in their view, "[t]he resulting

28

hole is not obviously a 'cut,'" creating "a conceptually difficult question of interpretation: when does a needle entry qualify as a 'cut' or 'wound' (and hence become 'incisive')," answered in turn by TBCE's "rational" conclusion focused on tissue removal. But these musings about needle points ultimately miss the point—regardless of the relative size of the instrument, or whether its effects on tissue are "obvious," it remains that the insertion of a needle EMG needle having a beveled edge would "cut" tissue, as it is designed to do, under any definition of that term. It would, therefore, be an "incisive" use of a needle. Consequently, the Chiropractor Parties' construction is contrary to the text of its own definition of "incision" as well as the underlying statutes. *See Gulf State Utils. Co.*, 809 S.W.2d at 207; *City of Garland*, 165 S.W.3d at 819.

It follows that the three challenged rule provisions purport to authorize chiropractors to perform "incisive" procedures that are beyond chiropractic's statutory scope—75.17(c)(2)(D) and 75.17(c)(3)(A) authorize chiropractors to perform needle EMG, and 75.17(a)(3) states that a procedure involving a needle is "incisive" only if it results in removal of tissue. In so doing, these rules exceed the statutory limits of chiropractic by, at a minimum, authorizing chiropractors to perform needle EMG with beveled-edged needles that are made to cut or incise tissue. They were, accordingly, beyond TBCE's statutory authority and void. *See Gulf States Utils. Co.*, 809 S.W.2d at 207. The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning needle EMG.

**MUA**

TCA's first and TBCE's third issue challenge the district court's summary judgment invalidating a provision of the scope-of-practice rule, subsection 75.17(e)(2)(O), that included MUA among the treatment procedures or services that chiropractors are expressly authorized

29

to perform. *See* 22 Tex. Admin. Code § 75.17(e)(2)(O). As previously noted, chiropractors are generally authorized to "perform[] nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ. Code Ann. § 201.002(b)(2); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(B) (tracking the same language in TBCE's scope-of-practice rule). In their summary-judgment motions, the Physician Parties sought to invalidate the rule's authorization of MUA on two basic grounds. First, they asserted that the authorization was contrary to the prohibition in occupations code section 201.154 barring TBCE from "adopt[ing] a process to certify chiropractors to perform manipulation under anesthesia." *See* Tex. Occ. Code Ann. § 201.154. Second, the Physician Parties urged that MUA was a "surgical" procedure excluded from the scope of chiropractic. *See id.* § 201.002(b)(2), (c)(1). In this regard, they relied on the definition or description of "surgical procedure" added by the Legislature in 2005: "'[s]urgical procedure' includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services." *Id.* § 201.002(a)(4). The district court did not specify in its summary-judgment order and judgment the ground or grounds on which it relied.[24] The Chiropractor Parties challenge both grounds on appeal, which they perceive to be related to one another.

---

[24] Although both sides reference explanatory letters from the district court that preceded its summary-judgment order and judgment, they acknowledge that the letters do not impact the standard or scope of our appellate review. *See Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990) (holding that trial court's letter to parties was not competent evidence of the trial court's basis for judgment); *Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20, 25 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (refusing to consider trial court's letter to parties explaining reasons why judge would grant summary judgment).

Regarding section 201.154's ban on TBCE "adopt[ing] a process to certify chiropractors to perform [MUA]," the Chiropractor Parties insist that a ban on "certifying" chiropractors to perform MUA means only that TBCE cannot create some sort of advanced training or "certification" process beyond licensing minimums as a prerequisite to being allowed to perform MUA, but does not prohibit chiropractors from performing the procedure itself. They add that such a ban further implies that MUA itself could not be banned anywhere in chapter 201, as otherwise section 201.154's "certification" ban would be redundant surplusage. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) (citing general rule that courts should avoid statutory constructions that create surplusage or fail to give effect to provisions).

As for the implications of occupations code 201.002(a)(4)'s definition or description of "surgical procedure" (i.e., the language added in 2005), TBCE in its scope-of-practice rule elaborated that "the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services," referenced in the statute, referred to "the American Medical Association's annual Current Procedural Terminology Codebook (2004)," which "has been adopted by the Centers for Medicare and Medicaid Services . . . as Level 1 of the common procedure coding system." *See* 22 Tex. Admin. Code § 75.17(b)(2) (defining "CPT Codebook"). Simply described, the CPT Codebook identifies several thousand medical procedures and services and provides a five-digit code and brief description for each. The American Medical Association began the development of the CPT coding system in 1966 to—

31

encourage the use of standard terms and descriptors to document procedures in the medical record; help[] communicate accurate information on procedures and services to agencies concerned with insurance claims; provide[] the basis for a computer oriented system to evaluate operative procedures; and contribute[] basic information for actuarial and statistical purposes.

American Medical Association, *CPT Coding Billing & Insurance, CPT Application Process FAQ*, http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding -billing-insurance/cpt/cpt-process-faq/code-becomes-cpt.page (last visited Mar. 13, 2012). Currently, the CPT is used "to report medical procedures and services under public and private health insurance programs . . . [and] is also used for administrative management purposes such as claims processing and developing guidelines for medical care review." *Id.* The AMA updates the CPT each year, effective January 1, to reflect new developments in medical procedures and services. *See id.*; *Practice Mgmt. Info. Corp. v. American Med. Ass'n*, 121 F.3d 516, 517 (9th Cir. 1997). The summary-judgment record contains excerpts from what appears to be a CPT Codebook for 2007,[25] one of the versions in effect during the course of this litigation.

The five-digit codes in the CPT are divided into three categories: Category I covers medical services and procedures; Category II includes codes related to performance measurement; and Category III lists the temporary codes for new and emerging technology. Category I is further divided into six sections—"evaluation," "anesthesia," "radiology," "pathology," "medicine," and, of relevance here, "surgery." *See* American Medical Association *Current Procedural Terminology (CPT®) 2007* xiv (4th ed. 2006). Within each section, procedures are arranged to enable the user

---

[25] *See* American Medical Association, *Current Procedural Terminology (CPT®) 2007* (4th ed. 2006).

to locate the code number readily. In the "surgical" section, the procedures are grouped according to the body system on which surgery is performed.

On appeal, TBCE concedes that "MUA is listed in the surgery section of the CPT Codebook and [is] thus a surgical procedure under the Chiropractic Act." *See also* 31 Tex. Reg. 4615 (2006) (Texas Bd. of Chiropractic Exam'rs) (stating the same thing). Nonetheless, TBCE insists that we must "harmonize" occupations code 201.002(a)(4), which would otherwise serve to exclude MUA from the scope of chiropractic, *see* Tex. Occ. Code Ann. § 201.002(c)(1), with the general statutory authorization of chiropractors to perform "adjustment and manipulation," *see id.* § 201.002(b)(2), and what it perceives to be an implicit authorization or recognition in occupations code 201.154 that chiropractors can perform MUA because, as previously explained, TBCE maintains that the section's ban on "certification" of chiropractors to perform MUA would otherwise be redundant surplusage. Relatedly, TBCE also invokes the principle that when statutory provisions irreconcilably conflict, the "more specific" provision—what they view as the implicit authorization of MUA present in section 201.154—should control over the "general" statutory exclusion of surgical procedures from chiropractic. *See* Tex. Gov't Code Ann. § 311.026(b) (West 2005) (providing that specific provision prevails over general); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 670 n.56 (Tex. 2009) (citing to government code section 311.026(b) for same proposition).

In contrast to TBCE, TCA vigorously disputes that MUA is "described in the surgery section" of the CPT Codebook in any sense relevant to chiropractors. While not disputing that the "surgery" section of the book has contained a description of MUA at all times relevant to our inquiry

33

here,[26] TCA insists that the reference "does not encompass chiropractic procedures." It emphasizes a cross-reference that appears in the 2007 CPT Codebook's description of MUA:

**Manipulation**

(For spinal manipulation without anesthesia, use 97140)

**22505**          Manipulation of spine requiring anesthesia, any region

American Medical Association, *2007 Current Procedural Terminology (CPT®) 2007* 85 (4th ed. 2006). TCA represents that the referenced code "97140" does not apply to chiropractors because there are different codes—98940 through 98943—that cover "chiropractic manipulative treatment." And because manipulation by chiropractors is not covered by the cross-referenced code 91740, it reasons, the "manipulation of spine requiring anesthesia" code from which the reference is made must likewise not apply to chiropractors. *See id.* at xiv, 85 (describing the "Surgery" section of the CPT codebook as including code numbers 10021 through 69990). The portions of the CPT Codebook concerning chiropractic manipulation do not appear in our record. Regardless, assuming that TCA's description of those codes is accurate, and even assuming it is correct in concluding that code 22505 ("manipulation of the spine requiring anesthesia," i.e., MUA) would not actually be the code applied by a chiropractor who was billing for the treatment, it remains undisputed that this code and accompanying description have appeared in the CPT Codebook's

---

[26] In fact, the 1970 edition of the CPT Codebook lists "22505 MANIPULATION SPINE ANY REGION, REQUIRING ANESTHESIA" in the surgery section using the same five-digit code used in the most current version of the CPT. *See* American Medical Association, *Current Procedural Terminology* 135 (2d ed. 1970); American Medical Association, *Current Procedural Terminology CPT® 2012* 75 (4th ed. 2011) ("**22505** Manipulation of spine requiring anesthesia, any region").

34

"surgery" section at all relevant times. This is all that the Legislature has required in order for MUA to be deemed a "surgical" procedure excluded from the scope of chiropractic: "'[s]urgical procedure' includes a procedure described in the surgery section of the [CPT Codebook]." *See* Tex. Occ. Code Ann. § 201.002(a)(4); 22 Tex. Admin. Code § 75.17(b)(2). The Legislature did not condition this requirement on the identity or type of health-care provider who performs the procedure. And in the face of this unambiguous statutory language, it is simply irrelevant whether, as TCA insists, a chiropractor would actually bill under code 22505. To the contrary, such a fact would, if anything, further confirm that the Legislature intended procedures "described" in the Codebook's "surgical" section be off-limits to chiropractors.

Nor should we construe section 201.002(a)(4) any differently to "harmonize" or avoid "conflict" with section 201.154, the provision barring TBCE from "adopt[ing] a process to certify chiropractors to perform [MUA]." As an initial observation, the gravamen of the Chiropractor Parties' position concerning section 201.154 is that the Legislature, despite its *specific* prohibition barring chiropractors from performing procedures listed under the CPT surgery codes, intended to *impliedly* allow chiropractors to perform one of the listed procedures. Their position further suggests that the Legislature intended (without explicitly saying so) that chiropractors be allowed to perform MUA, yet went out of its way to bar TBCE from requiring any additional training or qualifications beyond licensing minimums to ensure that chiropractors perform that procedure safely. Such a construction yields what approaches "absurd results" that we presume the Legislature could not possibly have intended. *See Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) ("The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." (citing

35

*City of Rockwall*, 246 S.W.3d at 625-26)). It is also unsupported by the text of section 201.154 itself.

The Chiropractor Parties' construction of section 201.154 assumes that the word "certify" expresses an intent to grant some special or additional type of authority to perform MUA beyond that conveyed through licensing. But "certify" simply means "to designate as having met the requirements for pursuing a certain kind of study or work." *See Webster's* 367 (defining "certify" and comparing to "license"); *see also Black's Law Dictionary* 258 (9th ed. 2009) (describing "certify" as "attest as being true or as meeting certain criteria"). It does not necessarily require some underlying, preexisting authority that would be enhanced, as it were, by the certification. In fact, the plain language of section 201.154—i.e., "the board may not adopt a process to certify chiropractors *to perform* [MUA]"—suggests that without certification, chiropractors lack the authority *to perform* MUA. *See* Tex. Occ. Code Ann. § 201.154 (emphasis added).

If the Legislature had intended "certify" to have the meaning that the Chiropractor Parties suggest here—i.e., that "certification" contemplates some special designation and presumes a status quo in which chiropractors can perform the procedure—a clearer statement of that intent would have been a prohibition against TBCE adopting a process to certify chiropractors, for example, "as an MUA specialist" or "in the field of MUA." *See, e.g.*, Tex. Occ. Code Ann. § 205.303(a) (West 2004) ("The medical board may certify a person *as an* acudetox *specialist* . . . .") (emphasis added); *id.* § 1701.404(b) (West Supp. 2011) ("The commission may certify a sheriff, sheriff's deputy, constable, other peace officer, county jailer, or justice of the peace *as a special* officer for offenders with mental impairments . . . .") (emphasis added). But the plain language of section 201.154 does not do this. Rather, it merely forbids TBCE from designating chiropractors

36

as having met the requirements *to perform* MUA. Therefore, it does not necessarily follow that chiropractors already have the authority to perform MUA.

For similar reasons, we also reject the TBCE's related contention that the "more specific" language of section 201.154 should control over the statute's general ban on surgical procedures. But even if we were to apply this canon of construction, section 201.154 cannot be said to be "more specific" than the ban on surgical procedures with regard to whether chiropractors may perform MUA. At best, section 201.154 implies that chiropractors may perform MUA, but section 201.002(a)(4) specifically provides that chiropractors may not perform MUA. Thus, 201.002(a)(4) is the specific provision that should control.

Although our construction here could appear, at first glance, to render section 201.154 superfluous given the Act's ban on MUA as a surgical procedure, it also can be viewed as reinforcing the Legislature's intent that chiropractors not perform MUA. *See Nash*, 220 S.W.3d at 917-18 (noting that "there are times when redundancies are precisely what the Legislature intended"); *In re City of Georgetown*, 53 S.W.3d 328, 335-36 (Tex. 2001) (construing duplicative provisions of the Open Records Act and concluding that "the Legislature repeated itself out of an abundance of caution, for emphasis or both"). In any event, occupations code section 201.002(a)(4) means what it says, and we cannot ignore this clear expression of legislative intent in the cause of avoiding any redundancy with section 201.154. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) ("'It is an elementary rule of construction that, *when possible to do so*, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous.'") (quoting *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915)).

Based on the unambiguous text of occupations code section 201.002(a)(4), we conclude that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic and that occupations code section 201.154 is not to the contrary. Although the Physician Parties also emphasize the anecdotal legislative history of section 201.154, the statutory text is dispositive here. *See DeQueen*, 325 S.W.3d at 635 (noting that courts should look first to the plain meaning of statutory text as expressing legislative intent); *Alex Sheshunoff*, 209 S.W.3d at 652 n.4 (noting that reliance on secondary materials such as legislative history should be avoided when text is unambiguous). We must, however, consider one final argument asserted by TCA.

TCA urges that if we construe section 201.002(a)(4) to deem MUA performed by chiropractors a "surgical procedure," we must invalidate the provision as an improper delegation of legislative authority that violates the separation-of-powers clause of the Texas Constitution.[27] *See* Tex. Const. art. III, § 1 (vesting the legislative power in the Senate and House of Representatives).[28] Specifically, the Chiropractor Parties assert that by effectively incorporating a coding system developed by the AMA—a private association (not to mention a longtime professional rival to chiropractors and chiropractic)—to supply a definition or description of "surgical procedure," the Legislature has delegated its authority to the AMA in a manner that fails the eight-factor balancing test articulated by the supreme court in *Texas Boll Weevil Eradication Foundation, Inc.*, 952 S.W.2d

---

[27] As was the case with TCA's assertion that MUA performed by chiropractors is not described in the surgical section of the CPT Codebook, TBCE does not join in this argument.

[28] Both the Physician Parties and the State of Texas assert that TCA waived this argument by non-suiting its affirmative claims for relief. To the contrary, TCA also raised this contention defensively, as a ground for denying the Physician Parties' summary-judgment motion, thereby preserving it for appeal. *See* Tex. R. Civ. P. 166a(c). Furthermore, in its notice of non-suit, TCA explicitly disclaimed any intent to waive its right to assert any defensive arguments.

at 472, for delegations of authority to private entities.[29] Although we agree that a delegation of unbridled discretion to the AMA to define "surgical procedures" would potentially raise constitutional concerns, *see id.* at 471-75, we disagree that the Legislature has delegated its authority in this situation.

Whether the Legislature has, in fact, delegated its authority to define "surgical procedures" to the AMA depends initially on whether section 201.002(a)(4) incorporates (1) some fixed version of the CPT Codebook or (2) the CPT Codebook in whatever manner the AMA may revise or amend it in the future. If the former, the Legislature has not delegated its authority to define "surgical procedure," but has instead defined that term itself, albeit by reference to another source. *See Ex parte Elliott*, 973 S.W.2d 737, 741 (Tex. App.—Austin 1998, pet. ref'd). This sort of cross-reference to fixed external fact, source, or standard is no more a delegation of legislative authority than a statutory reference to a measure of time or volume.

Although no party has emphasized it, we observe that TBCE's scope-of-practice rule defines the "CPT Codebook" as the version published by the AMA in 2004. *See* 22 Tex. Admin.

---

[29] Although the text of section 201.002(a)(4) itself refers to an agency of the federal government rather than the AMA ("the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services"), there is no dispute that at all relevant times CMS has fully incorporated the AMA's CPT coding system, as TBCE has acknowledged in its rules. *See* Department of Health & Human Services Medical Data Code Sets Rule, 45 C.F.R. § 162(b)(1) (2012) (adopting AMA's CPT codebook for the period from October 16, 2003 through September 30, 2013); 22 Tex. Admin. Code § 75.17(a)(4) (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice); *see also* HCPCS-General Information, Centers for Medicare & Medicaid Servs., https://www.cms.gov/MedHCPCSGenInfo (last visited Mar. 13, 2012) ("Level I of the HCPCS is comprised of CPT (Current Procedural Terminology), a numeric coding system maintained by the American Medical Association (AMA)."). Consequently, the statutory reference to the "common procedure coding system adopted" by CMS was, at least at the time of the statute's 2005 enactment, tantamount to incorporating the AMA's CPT Codebook.

Code § 75.17(b)(2) (identifying "the American Medical Association's annual Current Procedural Terminology CodeBook (2004)"). That is, in fact, the version of the CPT Codebook that was in effect when the Legislature adopted section 201.002(a)(4) in May 2005.[30] Thus, TBCE has interpreted section 201.002(a)(4) to incorporate a fixed version of the CPT Codebook. *See Ex parte Elliott*, 973 S.W.2d at 741. Moreover, we would reach the same conclusion even in the absence of this rule. In *Ex parte Elliott*, we considered, in the context of a habeas proceeding, whether the Legislature's incorporation of the Environmental Protection Agency's definition of "hazardous waste" was an unconstitutional delegation of legislative authority. *See id.* at 741. We held that the Legislature intended to adopt the EPA's definition of hazardous waste that existed on the date the relevant legislation was enacted. *See id.* In reaching our holding, we relied on supreme court precedent that (1) a statute that adopts another statute by reference adopts the referenced statute as it exists at the time of adoption, but not as it may be amended in the future, *see id.* (citing *Trimmier v. Carlton*, 296 S.W. 1070, 1074 (Tex. 1927)), and that (2) we must construe a statute subject to varying interpretations in a manner that assumes the Legislature's intent to enact a constitutional statute. *See id.* at 742 (citing *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex. 1990)); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005) (establishing presumption that the Legislature intended for statutes to be constitutional); *but see id.* § 311.027 (West 2005) (providing that statutory references to a statute or rule applies to revisions or amendments to the

---

[30] According to the evidence in the record, the AMA publishes the CPT Codebook annually in the late summer or early fall, to be effective January 1. Thus, the CPT Codebook in effect for the calendar year 2005—i.e., *CPT 2005*—would have had a publication date of 2004. *See, e.g.*, American Medical Association *Current Procedural Terminology CPT 2012* (4th ed. 2011) (designated as "CPT 2012," but published in 2011).

40

statute or rule). In this case, we would similarly construe section 201.002(a)(4) so as to avoid the potential constitutional infirmities and hold that it references the version of the CPT Codebook in effect on the date of its enactment, May 27, 2005. Under that construction, no delegation of the Legislature's authority to define "surgical procedure," much less an unlawful one, has occurred. *See Ex parte Elliott*, 973 S.W.2d at 742.

TCA counters that construing section 201.002(a)(4) to adopt a fixed version of the CPT Codebook poses due-process concerns because the AMA updates the CPT Codebook annually and prior versions of the CPT Codebook are "inaccessible." We simply note that, in addition to the fact that there is no summary-judgment evidence in the record that the 2004 edition of the CPT Codebook was inaccessible to any party, our own independent research on the delegation question has confirmed that this specific publication is available through public sources, including interlibrary loan from the Texas State Law Library. Thus, although not as readily accessible as the current version of the CPT Codebook, the 2004 CPT Codebook is not inaccessible.

As previously noted, there is no dispute that MUA was described in the "surgical" section of the CPT Codebook throughout the period at issue, including in its 2004 version. As there is no constitutional barrier to section 201.002(a)(4)'s enforcement, we must give it effect and hold that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic practice. *See* Tex. Occ. Code Ann. § 201.002(b)(2), (c)(1). Consequently, subsection 75.17(e)(2)(O), which purports to authorize chiropractors to perform MUA, is beyond TBCE's statutory authority and void. *See Gulf States Utils. Co.*, 809 S.W.2d at 207. The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning MUA.

41

**"Diagnosis"**

In its remaining issues, TCA (but not TBCE) challenges the district court's judgment invalidating rules authorizing chiropractors to make certain "diagnoses." In addition to responding to TCA's issues, the Physician Parties assert what they term a "cross-point" urging affirmance based on the grounds they raised in their first motion for partial summary judgment, and also what is substantively a motion to dismiss one of TCA's issues for lack of subject-matter jurisdiction. Before turning to the parties' competing contentions, it is necessary to clarify, at some length, the specific rules at issue, the scope of the district court's ruling, and the procedural posture of the remaining issues on appeal.

The statutory scope of chiropractic, again, includes "us[ing] objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body" and "perform[ing] nonsurgical, nonincisive procedures . . . to improve the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ. Code Ann. § 201.002(b)(1), (2). In subpart (d)(1) of its scope-of-practice rule, TBCE construed these provisions to permit chiropractors to render certain "analyses," "diagnoses," and "other opinions":

> (d)    Analysis, Diagnosis, and Other Opinions
>
> > (1)    In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:
> >
> > > (A)    An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following:
> > >
> > > > (i)    the health and integrity of the structures of the system;

42

(ii)     the coordination, balance, efficiency, strength, conditioning and functional health and integrity of the system;

(iii)    the existence of structural pathology, functional pathology or other abnormality of the system;

(iv)    the nature, severity, complicating factors and effects of said structural pathology, functional pathology, or other abnormality of the system;

(v)     the etiology of said structural pathology, functional pathology or other abnormality of the system; and

(vi)    the effect of said structural pathology, functional pathology or other abnormality of the system on the health of an individual patient or population of patients;

(B)    An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following:

(i)     the nature, severity, complicating factors and effects of said subluxation complex;

(ii)    the etiology of said subluxation complex; and

(iii)   the effect of said subluxation complex on the health of an individual patient or population of patients;

(C)    An opinion regarding the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(D)    An opinion regarding the likelihood of recovery of a patient or condition under an indicated course of treatment;

(E)    An opinion regarding the risks associated with the treatment procedures that are indicated in the therapeutic care of a patient or condition;

43

(F)     An opinion regarding the risks associated with not receiving the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(G)     An opinion regarding the treatment procedures that are contraindicated in the therapeutic care of a patient or condition;

(H)     An opinion that a patient or condition is in need of care from a medical or other class of provider;

(I)     An opinion regarding an individual's ability to perform normal job functions and activities of daily living, and the assessment of any disability or impairment;

(J)     An opinion regarding the biomechanical risks to a patient, or patient population from various occupations, job duties or functions, activities of daily living, sports or athletics, or from the ergonomics of a given environment; and

(K)     Other necessary or appropriate opinions consistent with the practice of chiropractic.

22 Tex. Admin. Code § 75.17(d)(1).  In a subpart (d)(2) to the rule, however, TBCE described several examples of "analyses,' "diagnoses," or "other opinions" that would be, in its view, outside the permissible scope of chiropractic practice:

(2)     Analysis, diagnosis, and other opinions regarding the findings of examinations and evaluations which are outside the scope of chiropractic include:

(A)     incisive or surgical procedures;

(B)     the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

(C)     the use of x-ray therapy or therapy that exposes the body to radioactive materials; or

44

(D)      other analysis, diagnosis, and other opinions that are inconsistent with the practice of chiropractic and with the analysis, diagnosis, and other opinions described under this subsection.

*Id.* § 75.17(d)(2).

In their live pleadings, the Physician Parties sought a declaration invalidating 75.17(d) in its entirety, as well as certain other rule provisions that defined terms used within that provision, on the basis that the provision exceeded the statutory scope of chiropractic and permitted chiropractors to practice medicine without a medical license, violating the Medical Practice Act and, alternatively, article XVI, section 31 of the Texas Constitution. Additionally, in the event 75.17(d) (or any of the challenged rules) were held to be within the statutory scope of chiropractic, TMA asserted an alternative constitutional challenge to the underlying statutes themselves under article XVI, section 31 of the Texas Constitution.

In their first motion for partial summary judgment, the Physician Parties asserted that they were entitled to a declaration invalidating 75.17(d) as a matter of law because the statutory scope of chiropractic permits licensees to "analyze, examine, or evaluate" certain conditions, but not to "diagnose" them, and "diagnose" is instead reserved to the practice of medicine and certain other health care professions. *Compare* Tex. Occ. Code Ann. § 201.002(b)(1) (one practices chiropractic if he or she "uses objective or subjective means to analyze, examine, or evaluate . . .") *with id.* § 151.002(a)(3) ("'[p]racticing medicine' means the diagnosis, treatment, or offer to treat . . ."). The Chiropractor Parties countered with their own motion for partial summary judgment seeking dismissal of the Physician Parties' claims that the use of the term "diagnosis" in its scope-of-practice rule exceeded chiropractic's statutory scope. They asserted that "diagnosis" in its ordinary meaning

45

broadly denoted a process of analysis and evaluation and was, therefore, included or implicit in the express statutory authorizations of chiropractors to "analyze," "examine," and "evaluate," if not also the authorizations to treat certain conditions. The district court denied the Physician Parties' motion and granted the Chiropractors' motions "in part as to the Chiropractic Board's use of the word 'diagnosis' in its rule." "However," the court emphasized in its order, it "reserve[d] judgment regarding 'diagnosis' as it relates to *scope of practice*." (Emphasis in original.)

Subsequently, the Physician Parties filed a second motion for partial summary judgment seeking relief only as to two portions of 75.17(d)—(d)(1)(A), which authorized "analysis, diagnosis or other opinion" concerning a list of six specific subjects "regarding the biomechanical condition of the spine or musculoskeletal system"; and (d)(1)(B), which authorized "analysis, diagnosis or other opinion" concerning a list of three specific subjects "regarding a subluxation complex of the spine or musculoskeletal system." *See* 22 Tex. Admin. Code § 75.17(d)(1)(A), (B). The basis of this motion was that these provisions exceeded chiropractic's statutory scope of practice and also violated article XVI, section 31 of the Texas Constitution by permitting chiropractors to "diagnose" conditions, such as diseases, that were beyond the "biomechanical condition[s] of the spine and musculoskeletal system of the human body" that chiropractors were statutorily permitted to "analyze, examine, or evaluate." *See* Tex. Occ. Code Ann. § 201.002(b)(1). The Chiropractor Parties countered with a joint "supplemental" motion for partial summary judgment and request for judicial notice urging that "diagnose" (which, again, they viewed as synonymous or implicit in "analyze," "examine," and "evaluate") encompassed diagnosis of diseases and any other matter listed

46

in 75.17(d)(1) and (2).[31]  Without stating the specific grounds on which it relied, the district court granted the Physician Parties' second motion for partial summary judgment and, as before, denied the Chiropractor Parties' motions except to the extent of granting them "as to the use of the word 'diagnosis' in the rule."

In its third issue, TCA urges that the district court erred in concluding that (d)(1)(A) (concerning "analysis, diagnosis or other opinion" regarding what were termed aspects of "the biomechanical condition of the spine or musculoskeletal system") exceeded chiropractic's statutory scope of practice.  In its fourth issue, it advances a similar contention as to the district court's invalidation of (d)(1)(B) (concerning "analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system").  In its fifth and final issue, TCA challenges the Physician Parties' alternative summary-judgment ground that (d)(1)(A) and (B) violated article XVI, section 31 of the Texas Constitution.

In addition to joining issue on the merits of TCA's third and fourth issues, the Physician Parties assert what they style as a "cross-point" urging that we affirm the summary judgment as to (d)(1)(A) and (B) on the ground, originally presented in their first motion for partial summary judgment, that the statutory scope of chiropractic does not include "diagnosing" a condition, as opposed to "analyzing, examining, or evaluating" it.  TCA replies, and we agree, that the Physician Parties' "cross-point" seeks relief beyond that which they were afforded in the district court's judgment, which explicitly granted the Chiropractor Parties' motion for partial

---

[31] Additionally, in the meantime, TBCE filed a motion for partial summary judgment seeking dismissal of the Physician Parties' constitutional claims challenging 75.17(d) and, alternatively, its underlying statutes.  However, we cannot discern from the record that TBCE ever obtained a ruling on this motion.

summary judgment "as to the use of the word 'diagnosis' in the rule" and left undisturbed numerous

provisions of 75.17(d) that explicitly authorize chiropractors to "diagnose."[32] Consequently, to raise

---

[32] The district court's judgment left intact the following provisions of 75.17(d) authorizing "diagnosis" by chiropractors:

    (d)    Analysis, Diagnosis, and Other Opinions

        (1)    In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions [i.e., "an analysis, diagnosis, or other opinion"] could include, but are not limited to, the following:

            . . .

            (C)    An opinion regarding the treatment procedures that are indicated in the therapeutic care of a patient or condition;

            (D)    An opinion regarding the likelihood of recovery of a patient or condition under an indicated course of treatment;

            (E)    An opinion regarding the risks associated with the treatment procedures that are indicated in the therapeutic care of a patient or condition;

            (F)    An opinion regarding the risks associated with not receiving the treatment procedures that are indicated in the therapeutic care of a patient or condition;

            (G)    An opinion regarding the treatment procedures that are contraindicated in the therapeutic care of a patient or condition;

            (H)    An opinion that a patient or condition is in need of care from a medical or other class of provider;

            (I)    An opinion regarding an individual's ability to perform normal job functions and activities of daily living, and the assessment of any disability or impairment;

48

this contention on appeal, the Physician Parties were required to file their own notice of appeal. *See* Tex. R. App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment . . . must file a notice of appeal."); *Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 584 (Tex. 2002); *Quimby v. Texas Dep't of Transp.*, 10 S.W.3d 778, 781 (Tex. App.—Austin 2000, pet. denied). They did not do so. We thus lack jurisdiction to consider the Physician Parties' "cross-point" and dismiss it.[33] *See Tarrant Restoration v. TX Arlington Oaks Apartments, Ltd.*, 225 S.W.3d 721, 733-34 (Tex. App.—Dallas 2007, pet. dism'd w.o.j.).

Conversely, the Physician Parties suggest that we lack subject-matter jurisdiction to consider TCA's fifth issue challenging the potential summary-judgment ground that 75.17(d)(1)(A) and (B) violate article XVI, section 31 of the Texas Constitution. Citing the portion of the district court's judgment stating that its summary-judgment rulings had rendered "moot" "TMA's and TMB's constitutional challenges," the Physician Parties accuse TCA of seeking an "advisory opinion" regarding a claim or issue that the district court never reached. We observe that while TMA's alternative constitutional challenges to the underlying statutes were never adjudicated below and would indeed have been mooted by the district court's summary-judgment rulings, it is unclear

---

(J)     An opinion regarding the biomechanical risks to a patient, or patient population from various occupations, job duties or functions, activities of daily living, sports or athletics, or from the ergonomics of a given environment; and

(K)     Other necessary or appropriate opinions consistent with the practice of chiropractic.

22 Tex. Admin. Code § 75.17(d)(1).

[33] We emphasize that we express no opinions regarding the merits of the cross-point that the Physician Parties attempt to assert.

whether the district court's reference to "moot" "constitutional challenges" was intended also to refer to the constitutional challenge to rule 75.17(d)(1)(A) and (B), as opposed to the statutes, that the Physician Parties had presented as a ground for partial summary judgment. Regardless, we ultimately agree with the Physician Parties that TCA's fifth issue is moot, if for no other reason than that the Physician Parties, by taking the position that the district court never reached their summary-judgment ground concerning the constitutionality of 75.17(d)(1)(A) and (B), have conceded that we cannot affirm the summary judgment invalidating those provisions on that basis.

Having thus clarified and narrowed the matters in dispute, the sole dispositive questions remaining before us in regard to 75.17(d)(1)(A) and (B) are whether those rule provisions exceed the statutory scope of chiropractic—assuming, as we must do in the present procedural posture, that TBCE's use of the term "diagnosis" does not in itself cause the provision to exceed the statutory or permissible constitutional scope of chiropractic practice.

### *"Diagnoses" and "opinions" regarding the "biomechanical condition of the spine or musculoskeletal system"*

Subpart (d)(1)(A) of TBCE's scope-of-practice rule allows a chiropractor, again, to render "an analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system" and provides a non-exclusive list of examples of such analyses, diagnoses, and opinions that TBCE has determined fit within this provision. *See* 22 Tex. Admin. Code § 75.17(d)(1)(A). Although the district court did not specify the grounds on which it relied to find this provision invalid, the Physician Parties argued in support of their motion for summary judgment, and also in their briefs to this Court, that this provision improperly allows chiropractors to diagnose diseases that cannot be considered biomechanical conditions of the spine

or musculoskeletal system. On appeal, TCA responds that when read in the context of the rule as a whole, subpart (d)(1)(A) does not exceed the statutory scope of chiropractic because it limits chiropractors to making diagnoses only regarding the biomechanical condition of the spine or musculoskeletal system, consistent with the statutory scope of chiropractic. *See* Tex. Occ. Code Ann. § 201.002(b)(1); 22 Tex. Admin. Code § 75.17(d)(1)(A). We agree.

The effect of our procedurally required assumption that TBCE's use of the term "diagnosis" does not in itself cause the scope-of-practice rule to exceed the statutory scope of chiropractic is that the word "diagnose" is synonymous with the phrase "analyze, examine, or evaluate" in the statutory scope of chiropractic. *See* Tex. Occ. Code Ann. § 201.002(b)(1). As such, subpart (d)(1)(A) effectively tracks the Legislature's scope of chiropractic:

| Tex. Occ. Code Ann. § 201.002(b)(1) | 22 Tex. Admin. Code § 75.17(d)(1)(A) |
|---|---|
| (b) A person practices chiropractic under [the Chiropractic Act] if the person: | (1) In the practice of chiropractic, licensees may render and analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following: |
| (1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body[.] | (A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following [list of examples]. |

*Id.*; 22 Tex. Admin. Code § 75.17(d)(1)(A). Thus, the plain language of (d)(1)(A) limits chiropractors to diagnosing—i.e., "analyzing, examining, or evaluating"—biomechanical conditions of the spine or musculoskeletal system. Further, because the list of non-exclusive examples of such "diagnoses" are grammatically dependent on or otherwise stem from the paragraph's initial statement

51

that the diagnosis *regard* the biomechanical condition of the spine or musculoskeletal system, the listed examples are likewise limited to the biomechanical condition of the spine or musculoskeletal system of the human body. In other words, the non-exclusive list of example opinions or diagnoses cannot be read in isolation; rather, they must be read as being dependent upon or bounded by the restriction that they also regard the biomechanical condition of the spine or musculoskeletal system. To that extent, this complies with the statutory scope of chiropractic.

The Physician Parties counter that this provision does not restrict chiropractors to the biomechanical condition of the spine or musculoskeletal system because it allows them to diagnose diseases without limitation. In support of this contention, they point to the rule's "expansive definitions" of "musculoskeletal system"[34] and "subluxation complex,"[35] the rule's "broad catch-all phrases "including but not limited to," "structural pathology," "functional pathology," and "etiology," and finally to their assertion that the common, ordinary meaning of the word "diagnose" incorporates identification of diseases, *see Webster's* at 622 (defining "diagnose" as "to identify (as a disease or condition) by symptoms or distinguishing characteristics"); *American Heritage College Dictionary* at 383 (defining "diagnosis" as "act or process of determining the nature and cause of a disease or injury through examination of a patient"). Specifically, they assert that because "biomechanical" refers only to the application of mechanical principles—i.e., the action

---

[34] "The system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." 22 Tex. Admin. Code § 75.17(b)(4).

[35] "[A] neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them." *Id.* § 75.17(b)(7).

52

of forces on matter or material, *see Webster's* at 1401 (defining "mechanics" and "mechanical")—to living bodies and does not involve diseases of any kind, chiropractors may not render a diagnosis, which by definition involves the identification of a disease. Relatedly, they point to the rule's use of "pathology" and "etiology," which also involve the study of disease, *see Dorland's* at 690 (defining "etiology" as "the study or theory of the factors that cause disease"), 1416 (defining "pathology" as "the branch of medicine that deals with the essential nature of disease"), to argue that this provision of the scope-of-practice rule allows chiropractors to diagnose a wide range of diseases and conditions, including various cancers, arthritis, osteoporosis, gout, ALS, and bone fractures.

But apart from the fact that the common, ordinary meaning of "diagnosis" also includes the identification of a "condition" or an "injury," *see Webster's* at 622; *American Heritage College Dictionary* at 383, the Physician Parties' argument presumes that "disease" would extend beyond the biomechanical condition of the spine or musculoskeletal system of the human body. This construction, as previously suggested, ignores the plain language of the rule restricting any such diagnosis to the biomechanical condition of the spine or musculoskeletal system. The text and format of this provision plainly shows that "the system" discussed in each of the examples is "the biomechanical condition of the spine and musculoskeletal system" referred to at the beginning of the provision. Stated another way, each of the listed examples is limited to the Legislature's standard of "biomechanical condition of the spine and musculoskeletal system." Thus, regardless of whether diagnosis, pathology, or etiology invoke concepts of disease as the Physician Parties suggest, the bottom line is that paragraph (d)(1)(A) limits chiropractors to diagnoses regarding "the biomechanical condition of the spine and musculoskeletal system" as required by the statutory scope of chiropractic. Accordingly, the provision does not exceed the statutory scope of chiropractic.

53

In a related argument, the Physician Parties challenge TBCE's use of the phrase "could include, but are not limited to" in subpart (d)(1) of the scope-of-practice rule, suggesting that it, in combination with the issues discussed above, eviscerates any purported limitation on chiropractors' authority to diagnose by allowing chiropractors to "diagnose any diseases (pathology) that relate to the biomechanical condition of the spine and musculoskeletal system (redefined to include nerves and other tissues), determine their origins (etiology) and provide a prognosis on the disease's effect." But this argument requires reading 75.17(d)(1) in an unnecessarily strained manner.

As set forth above, paragraph (d)(1) states that chiropractors "may render an analysis, diagnosis, or other opinion *regarding* the findings of examinations and evaluations. *Such opinions could include, but are not limited to, the following*[.]" *See* 22 Tex. Admin. Code § 75.17(d)(1) (emphases added). "But are not limited to" as it is used here merely means that the list of examples that follows is not a comprehensive list of every type of authorized opinion—i.e., there could be other types of opinions that fit within the parameters of the provision that are not mentioned in the list. Also, use of this phrase does not alter the limitation in the rule that the "diagnosis" referred to must regard the findings of "examinations and evaluations," a phrase that itself is described earlier in the scope-of-practice rule in terms of the statutory scope of chiropractic:

(c)     Examination and Evaluation

    (1)     In the practice of Chiropractic, licensees of this board provide necessary examination and evaluation services to:

        (A)     Determine the bio-mechanical condition of the spine and musculoskeletal system of the human body including, but not limited to, the following . . . .

. . . .

> (B)    Determine the existence of subluxation complexes of the spine and musculoskeletal system of the human body and to evaluate their condition including, but not limited to . . . .

*Id.* § 75.17(c)(1)(A), (B). Thus, the plain language of 75.17(d)(1) provides that chiropractors may render diagnoses regarding findings and examinations within the statutory scope of chiropractic, and offers a non-exclusive list of examples of *such* opinions. It does not, by its plain language, allow them to render diagnoses that do not involve the statutory scope of chiropractic. As such, it does not exceed the statutory scope of chiropractic.

We sustain TCA's third issue.

***"Diagnoses" and "opinions" regarding "a subluxation complex of the spine or musculoskeletal system"***

Relatedly, the Physician Parties argued successfully to the district court that the following paragraph of TBCE's scope-of-practice rule, (d)(1)(B), also exceeds the statutory scope of chiropractic:

> (1)    In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:
>
> . . .
>
> (B)    An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following: [list of examples].

55

22 Tex. Admin. Code § 75.17(d)(1)(B). Initially, the Physician Parties argue that this paragraph of the scope-of-practice rule is invalid because it allows chiropractors to *diagnose* a subluxation complex despite the fact that the statutory scope of chiropractic only allows chiropractors to *treat* the subluxation complex. *Compare* Tex. Occ. Code Ann. § 201.002(b)(1) (allowing chiropractors "*to analyze, examine, or evaluate* the biomechanical condition of the spine or musculoskeletal system") (emphasis added) *with id.* § 201.002(b)(2) (allowing chiropractors "*to . . . perform procedures* to improve the subluxation complex or the biomechanics of the musculoskeletal system) (emphasis added). Stated another way, the Physician Parties argue that while chiropractors—again assuming our procedural limitations as to "diagnosis"—may diagnose the biomechanical condition of the spine or musculoskeletal system, they can only treat, but not diagnose, the subluxation complex. We find this argument unpersuasive.

This argument suggests that the Legislature intended to allow chiropractors to treat a condition that is undisputedly unique to the practice of chiropractic, while also deliberately depriving them of the ability to analyze, examine, evaluate, or (given our procedural posture) "diagnose" that condition. We cannot see how a chiropractor would know *to treat* a subluxation complex if he had not first determined from an analysis, examination, or evaluation/ "diagnosis" that there was a problem with the subluxation complex that needed chiropractic treatment. A more logical interpretation, and one supported by the text of both the occupations code and TBCE's scope-of-practice rule and by the summary-judgment evidence, is that a subluxation complex is part of the biomechanical condition of the spine or musculoskeletal system of the human body and, thus, may be analyzed, evaluated, examined, and diagnosed by chiropractors.

TBCE's unchallenged definition of "subluxation complex" establishes that it is a—

> neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them.

22 Tex. Admin. Code § 75.17(b)(7). The rule also defines "musculoskeletal system" as the "system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." *See id.* § 75.17(b)(4). "Neuro-" is a prefix meaning "nerve," *see Dorland's* at 1284, and "articular" refers to joints, *see id.* at 160. To a certain extent, then, use of the prefix "neuro-" with the adjective "articular" in connection with "musculoskeletal" is redundant in that TBCE's definition of "musculoskeletal system" already includes both nerves and joints. Nevertheless, the bottom line here is that 75.17(d)(1)(B) allows chiropractors to diagnose a condition that under unchallenged rules is part of the musculoskeletal system of the human body. To that extent, it comports with the statutory scope of chiropractic.

The Physician Parties also contend that the language of paragraph (d)(1)(B) allows chiropractors, in violation of the statutory scope of chiropractic, to diagnose neurological conditions, pathological and neuro-physiological consequences that effect the spine and musculoskeletal system, and "other body systems" that are affected by subluxation. We disagree that this provision sweeps so broadly. Although the definition of "subluxation complex" indicates that its existence may have functional or pathological consequences or that it may affect essentially every part of the body, the rule itself only allows chiropractors to render an analysis, diagnosis, or other opinion regarding a

57

subluxation complex of the spine or musculoskeletal system. Accordingly, it does not exceed the statutory scope of chiropractic.

We sustain TCA's fourth issue.

**CONCLUSION**

Having determined that, in the procedural posture of this appeal, the district court erred in its judgment invalidating subparts 75.17(d)(1)(A) and (B) of TBCE's scope-of-practice rule, we reverse that portion of the judgment. In light of our reversal of the district court's summary judgment invalidating subparts 75.17(d)(1)(A) and (B) of the scope-of-practice rule, we remand the case for further proceedings regarding the Physician Parties' alternative constitutional challenges. Having otherwise overruled each of the Chiropractor Parties' issues on appeal, we affirm the remainder of the district court's judgment that subparts 75.17(a)(3), (c)(2)(D), (c)(3)(A), and (e)(2)(O) of TBCE's scope-of-practice rule are void.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed in part; Reversed and Remanded in part

Filed: April 5, 2012