# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-12-00335-CV

**The Texas Commission on Environmental Quality and Waste Control Specialists, LLC, Appellants**

**v.**

**Sierra Club, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. D-1-GN-09-000894, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated April 18, 2014, and substitute the following opinion and judgment in their place. Appellee Sierra Club's motion for rehearing is denied.

Appellants the Texas Commission on Environmental Quality (TCEQ) and Waste Control Specialists, LLC (WCS) appeal from a district-court judgment that reversed a TCEQ order granting WCS a low-level radioactive waste disposal license. Sierra Club sought judicial review of TCEQ's order on the grounds that TCEQ erred by issuing the license before WCS had title to the relevant property interests and by denying Sierra Club's contested-case hearing request. The district court agreed with Sierra Club that it was error to deny the hearing request, reversed TCEQ's order on that ground, and remanded the case for a contested-case hearing on the merits of

WCS's application. On appeal, TCEQ and WCS challenge the district court's judgment, arguing that (1) TCEQ properly denied Sierra Club's hearing request, and (2) the district court should not have allowed Sierra Club to supplement the administrative record. For the reasons explained below, we reverse the district court's judgment and render judgment affirming TCEQ's order.

## BACKGROUND

WCS is a waste-control company specializing in the treatment, storage, and disposal of radioactive, hazardous, and mixed waste. WCS holds licenses to dispose of industrial and hazardous waste and to process, store, and dispose of radioactive material at a 36-acre waste-disposal facility in Andrews County, Texas. WCS's disposal facility, which is situated within a 14,900-acre former ranch that extends into Lea County, New Mexico, is about 25 feet east of the Texas–New Mexico border, five miles east of Eunice, New Mexico, and 30 miles west of Andrews, Texas.[1]

In August 2004, WCS filed an application with TCEQ for a license to construct and operate two facilities on its ranch property for the near-surface land disposal of low-level radioactive waste.[2] *See* Tex. Health & Safety Code §§ 401.101 (requiring license for disposal of radioactive

---

[1] This facility has been and is the subject of numerous lawsuits. *See, e.g.*, *Sierra Club v. Texas Comm'n on Envtl. Quality*, No. 03-11-00102-CV (Tex. App.—Austin Dec. 30, 2014, no pet. h.), *available at* http://www.txcourts.gov//3rdcoa; *In re Sierra Club*, 420 S.W.3d 153, (Tex. App.—El Paso Nov. 28, 2012, orig. proceeding); *Sierra Club v. Andrews Cnty.*, 418 S.W.3d 711 (Tex. App.—El Paso 2013, pet. filed); *Texas Comm'n on Envtl. Quality v. Sierra Club*, No. 03-12-00625-CV, 2014 WL 902513 (Tex. App.—Austin Mar. 7, 2014, no pet. h.); *In re Sierra Club*, No. 03-12-00712-CV, 2012 WL 6554812 (Tex. App.—Austin Dec. 14, 2012, orig. proceeding, mem. op.); *In re Sierra Club*, No. 08-12-00282-CV, 2012 WL 5949789 (Tex. App.—El Paso Nov. 28, 2012, orig. proceeding, mem. op.).

[2] Low-level radioactive waste is a broad category of waste defined by statute, *see* Tex. Health & Safety Code § 401.004, but it can be described simply, albeit circularly, as all radioactive wastes that are not classified as high-level radioactive wastes, including high-level wastes such

2

waste), .201 (directing TCEQ to regulate disposal of low-level radioactive materials), .202 (granting TCEQ licensing authority over disposal of low-level radioactive waste). The first of WCS's proposed facilities will receive and dispose of commercially-generated waste from Texas and Vermont as well as other waste approved for importation to Texas by the Texas Low Level Radioactive Waste Disposal Compact Commission.[3] The second proposed facility will receive and dispose of low-level radioactive waste that is the responsibility of the federal government under the federal Low Level Radioactive Waste Policy Act and its amendments. *See* 42 U.S.C. § 2021b–j (provisions of federal act); *see also* Tex. Health & Safety Code §§ 401.2005(4) (defining "federal facility waste"), .216 (granting TCEQ authority to license federal-facility waste disposal).

After declaring WCS's application administratively complete in February 2005, TCEQ began its technical review of the application, including preparation of a written analysis of the facilities' effect on the environment. *See generally* Tex. Health & Safety Code §§ 401.101–.119

as "spent reactor fuel, wastes from reprocessed reactor fuel, uranium mine and mill tailings or items contaminated with specified levels of transuranic elements," H.R. Rep. No. 314, 99th Cong., 1st Sess., pt. 2, at 15 (1985). Examples of low-level radioactive waste include medical clothing and laboratory glassware. Office of Tech. Assessment, OTA-0-426, Partnership Under Pressure: Managing Commercial Low-Level Radioactive Waste (1989); National Council on Radiation Prot. and Measurements, NCRP Comm. No. 5, Review of the Publication, Living Without Landfills (1989).

[3] The federal Low Level Radioactive Waste Policy Act, as amended in 1985, *see* 42 U.S.C. §§ 2021b–2021j, requires each state to provide for the disposal of low-level radioactive waste generated within its borders, *see id.* § 2021c. That same legislation encourages states to enter into agreements with other states to establish low-level radioactive waste disposal sites. *See id.* § 2021d. The Texas-Vermont Compact, as its name suggests, is an agreement between Texas and Vermont that requires Texas to develop, operate, and maintain, for compensation, a facility for the disposal of Texas and Vermont wastes. *See* Texas Low-Level Radioactive Waste Disposal Compact Consent Act, Pub. L. No. 105-236, 112 Stat. 1542, 1542–43 (codified at 42 U.S.C. § 2021d (2006)) (text of agreement); Tex. Health & Safety Code §§ 403.001–.006 ("Texas Low-Level Radioactive Waste Disposal Compact"). The Texas Low Level Radioactive Waste Disposal Compact Commission was created by and is responsible for administering the provisions of the Texas-Vermont Compact. *See* Tex. Health & Safety Code §§ 403.005 (powers and duties of commission), .006 (text of compact).

(general provisions regarding licensing and registration), .2005–.251 (provisions specific to low-level radioactive waste disposal); 30 Tex. Admin. Code §§ 336.701–.747 (TCEQ rules regarding low-level radioactive waste disposal licensing); 30 Tex. Admin. Code §§ 336.801–.825 (TCEQ rules regarding compact waste disposal facility application selection process). TCEQ retained the University of Texas Bureau of Economic Geology and Texas A&M University's Department of Nuclear Engineering to assist with the environmental analysis. During the review, which took place over three years, TCEQ notified WCS of numerous problems and deficiencies with the application, and WCS addressed the deficiencies in various supplements to its original license application. TCEQ's draft environmental analysis, which was completed in August 2008, included the following required information:

(1)     an assessment of radiological and nonradiological effects of the activity on the public health;

(2)     an assessment of any effect on a waterway or groundwater resulting from the activity;

(3)     consideration of alternatives to the activities to be conducted under the license; and

(4)     consideration of the long-term effects associated with activities, including decommissioning, decontamination, and reclamation impacts, including the management of low-level radioactive waste, to be conducted under the license.

Tex. Health & Safety Code § 401.113(c); *see id.* § 401.231 (contents of administratively complete application for low-level radioactive waste disposal license); 30 Tex. Admin. Code § 336.705

4

(TCEQ rule regarding contents of application for low-level radioactive waste application).[4]  The environmental analysis concluded that WCS's proposed facility was "adequate to protect the public health and safety in that [it] provides reasonable assurance that the general population will be protected from releases of radioactivity" as required by TCEQ regulations.  *See* 30 Tex. Admin. Code §§ 336.1–.1317 (Radioactive Substances Rules).

Based on the technical review of WCS's application, TCEQ's Executive Director concluded that WCS's final application met the relevant statutory and regulatory requirements.  He then prepared a draft license that generally required WCS to construct and operate the landfill as described in its final application, but which also included additional license terms to address concerns raised during the technical review and environmental analysis.  For example, to address potential groundwater intrusion, the draft license included a provision changing the boundary and raising the facility floor of one landfill to maintain an appropriate buffer zone of unsaturated soil.  The draft license also included a prohibition against receiving waste by rail because the application did not address the management of waste at railcar facilities.  As a final example of modifications, the draft license required additional environmental monitoring and studies to confirm that site characteristics used in the models accurately depicted actual conditions.

In August 2008, the Executive Director published the draft license and the draft environmental analysis for public notice.  During the public-comment period, Sierra Club timely submitted written comments opposing the license, arguing that WCS's application was incomplete and emphasizing its contention that the draft environmental analysis raised technical questions

---

[4]  All references to Title 30 of the Texas Administrative Code are to rules promulgated by TCEQ.

concerning the application. Sierra Club also requested a contested-case hearing on the merits of WCS's application, identifying two of its members, Rose Gardner and Fletcher Williams of Eunice, New Mexico, as members who had standing to request a hearing in their own right because they lived and owned businesses, used highways, and used natural resources in the vicinity of the proposed facility.[5] *See id.* § 401.239(a) (giving "affected person" right to contested-case hearing); 30 Tex. Admin. Code §§ 55.251–.256 (allowing "affected person" to request hearing and setting forth factors to determine affected-person status). Both TCEQ's Executive Director and WCS recommended that Sierra Club's hearing request be denied, arguing that neither Gardner nor Williams had standing to request a contested-case hearing because neither qualified as an "affected person" under relevant statutes and TCEQ regulations. The Office of Public Interest Counsel[6] encouraged the commission to grant the hearing requests because, in its opinion, Sierra Club's request met the requirements for associational standing.

TCEQ's commissioners evaluated Sierra Club's hearing request and WCS's license application at a January 2009 hearing. After reviewing Sierra Club's request, the responses to that request, Sierra Club's reply, WCS's sworn application, the Executive Director's technical review, including the environmental analysis, and other information before the commission, two of the three commissioners voted to deny Sierra Club's hearing request and to issue the license to WCS.[7]

---

[5] Gardner and Williams are the same members Sierra Club relied on in connection with the contested-case hearing request at issue in *Sierra Club*, No. 03-11-00102-CV (affirming denial of hearing request in by-product licensing matter at same disposal site).

[6] The primary duty of the Office of Public Interest Counsel is "to represent the public interest as a party to matters before the [TCEQ]." Tex. Water Code § 5.271.

[7] At the hearing, the third commissioner asked TCEQ's general counsel whether WCS had met the Texas Radiation Control Act's (TRCA) property-acquisition requirements. *See* Tex. Health & Safety Code § 401.204. When TCEQ's general counsel responded that WCS had not yet acquired

6

After exhausting its administrative remedies, Sierra Club filed the underlying suit for judicial review of TCEQ's order in Travis County District Court, seeking to—

- reverse TCEQ's decision to grant the license and render a decision that TCEQ exceeded its statutory authority in considering the application before WCS acquired all property interests;

- reverse TCEQ's decision to deny Sierra Club's hearing request and remand for reconsideration of that decision or for an evidentiary hearing regarding the hearing request; or

- reverse TCEQ's decision to grant the license and remand for a denial of the application or for a contested-case hearing on the merits of the application.[8]

Sierra Club argued in its petition to the district court that TCEQ erred by considering WCS's application before WCS had acquired total ownership of the mineral rights underlying the disposal site and also by denying Sierra Club's request for a contested-case hearing. WCS and TCEQ filed pleas to the jurisdiction and special exceptions that were later denied. And in response to a motion by Sierra Club to supplement the administrative record, which was denied in part and granted in part, the district court admitted into evidence two internal TCEQ memos related to a different licensing matter and an affidavit from a separate case.

After a bench trial on the merits, the district court issued a final order "find[ing] that the TCEQ erred in denying Sierra Club's Hearing Request regarding WCS's Application," reversing

---

all the property, the third commissioner announced he would not participate in the deliberation of WCS's application based on his "belief that section 401.204 precludes" consideration of the license until all property interests are acquired. TCEQ's order granting the license was predicated "upon a demonstration by [WCS] that [WCS] has acquired free and clear title to and all interests in land and buildings, including the surface and mineral estates, of the proposed disposal sites."

[8] Sierra Club filed two separate petitions for judicial review of TCEQ's order. These suits were ultimately consolidated in the underlying suit.

TCEQ's January 20, 2009 order, and remanding the matter to TCEQ "to allow Sierra Club to participate in a contested case hearing." The order denied all other requested relief. It is from this final order that TCEQ and WCS now appeal.

## DISCUSSION

In two issues, TCEQ and WCS (1) defend the propriety of TCEQ's decision to deny Sierra Club's hearing request and (2) challenge the district court's decision to allow Sierra Club to supplement the administrative record.

**Sierra Club's Request for a Contested-Case Hearing**

In their first issue, TCEQ and WCS assert that TCEQ's denial of Sierra Club's hearing request was proper because the two members that Sierra Club relied on as "affected persons" in support of its request are not affected persons under the relevant statutes and regulations. *See id.* § 401.003(15) (defining "affected person"); 30 Tex. Admin. Code § 55.256 (affected-person factors). Sierra Club, relying on our decision in *City of Waco v. Texas Commission on Environmental Quality*, 347 S.W.3d 366 (Tex. App.—Austin 2012), *reversed by* 413 S.W.3d 409 (Tex. 2013), maintains that TCEQ's denial of Sierra Club's hearing request was arbitrary and capricious because Sierra Club alleged sufficient facts in its request to satisfy the hearing-request requirements.[9]

---

[9] Sierra Club also asserts on appeal that the conditional nature of TCEQ's order—i.e., that it would not be granted until WCS acquired all necessary title to property—supports affirming the district court's order. Although Sierra Club raised this issue at the district court, the district court's judgment denied "all other relief not expressly granted." Thus, resolution of this issue in Sierra Club's favor would require altering the district court's judgment. However, Sierra Club did not file a notice of appeal. Accordingly, we lack jurisdiction to consider this issue. *See Texas Bd. of Chiropractic Exam'rs. v. Texas Med. Ass'n*, 375 S.W.3d 464, 492 (Tex. App.—Austin 2012, pet. denied) (holding that party seeking to alter trial court's judgment must file notice of appeal).

8

*Contested-case hearing requests*

The Texas Radiation Control Act (TRCA) governs the development, use, storage, processing, and disposal of radioactive materials in Texas, including the low-level radioactive waste at issue in this case. *See* Tex. Health & Safety Code §§ 401.001–.002 (TRCA's policy and purposes); *see also id.* §§ 401.2005–.251 (TRCA provisions specific to low-level radioactive waste). TRCA gives TCEQ the sole authority to regulate and license the disposal of low-level radioactive waste. *See id*. §§ 401.201–.202. Under TRCA, TCEQ must hold a contested-case hearing on the merits of an application for a low-level radioactive waste disposal license if a "person affected" requests such a hearing. *See id.* § 401.239(a). Thus the critical, or threshold, inquiry in contested-case hearing requests—and importantly the focus of the parties to this appeal—is whether the person requesting the hearing is an "affected person." *See City of Waco*, 413 S.W.3d at 417. That question, in turn, is principally controlled by the affected-person factors created by TCEQ:

> (a) For any application, an affected person is one who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the application. An interest common to members of the general public does not qualify as a personal justiciable interest.
>
> . . .
>
> (c) All relevant factors shall be considered, including, but not limited to, the following:
>
> > (1) whether the interest claimed is one protected by the law under which the application will be considered;
> > (2) distance restrictions or other limitations imposed by law on the affected interest;
> > (3) whether a reasonable relationship exists between the interest claimed and the activity regulated;
> > (4) likely impact of the regulated activity on the health, safety, and use of property of the person;

9

  (5)  likely impact of the regulated activity on use of the impacted natural resource by the person; and

  (6)  for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code § 55.256 ("Determination of Affected Person"); *see* Tex. Water Code § 5.115(a) (directing TCEQ to adopt rules specifying factors that must be considered in determining affected-person status); *see also City of Waco*, 413 S.W.3d at 416–17, 420 (discussing TCEQ-created factors). If, upon consideration of these factors at a Commission meeting,[10] the TCEQ commissioners determine that the requestor is an affected person and otherwise meets the regulatory requirements regarding contested-case hearings, the commissioners must grant the hearing request and refer the application to the State Office of Administrative Hearings for a contested-case hearing. *See* 30 Tex. Admin. Code § 55.255(a)(3) (Commission Action on Hearing Request). Conversely, if the TCEQ commissioners determine that the requestor is not an affected person or that the hearing request does not otherwise meet the regulatory requirements, the commissioners may, as they did here, deny the hearing request and act on the permit application without a contested-case hearing, *see id.* § 55.255(a)(1), or instead schedule additional public hearings before acting on the application, *see id.* § 55.255(a)(2).

  ***Standard of review***

    We review a TCEQ determination regarding affected-person status for an abuse of discretion. *Sierra Club v. Texas Comm'n on Envtl. Quality*, No. 03-11-00102-CV, slip op. at 11

---

  [10] Upon receiving a hearing request, TCEQ's executive director must schedule the hearing request for consideration at a commission meeting and allow the executive director, public interest counsel, and the permit applicant to file responses to the hearing request and the hearing requestor an opportunity to reply. *See* 30 Tex. Admin. Code § 55.254(c)(2), (e)–(f) (Hearing Request Processing).

(Tex. App.—Austin Dec. 30, 2014, no pet. h.), *available at* http://www.txcourts.gov//3rdcoa (citing *City of Waco*, 413 S.W.3d at 411, 420, 424). An agency abuses its discretion in making a decision if it "(1) fails to consider a factor the Legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the Legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst*, 411 S.W.2d at 360 n.8); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985) (the test for an abuse of discretion is whether "the trial court acted without reference to any guiding rules and principles" or "whether the act was arbitrary or unreasonable").

In making a decision regarding affected-person status, TCEQ enjoys the discretion to weigh and resolve matters that may go to the merits of the underlying application, including the likely impact the regulated activity—here, underground disposal of low-level radioactive waste—will have on the health, safety, and use of property by the hearing requestor and on the use of natural resources. *See Sierra Club*, No. 03-11-00102-CV, slip op. at 12 (citing 30 Tex. Admin. Code § 55.256(c); *City of Waco*, 413 S.W.3d at 420 (noting overlap between affected-person factors and exemption found to be dispositive in that case)). TCEQ's inquiry into these and the other factors may include reference to the permit application, attached expert reports, the analysis and opinions of professionals on its staff, and any reports, opinions, and data it has before it. *See id.* (citing *City of Waco*, 413 S.W.3d at 420–21 (describing these evidentiary items as relevant to inquiry and holding that there was evidence in record to support TCEQ's determination)). And importantly, the existence of substantial evidence in the record supporting TCEQ's decision is a factor—often a dispositive factor—in determining whether TCEQ abused its discretion. *See id.* (citing *City of*

11

*Waco*, 413 S.W.3d at 424–25); *see also Quixtar Inc. v. Signature Mgmt. Team, LLC*, 315 S.W.3d 28, 35 (Tex. 2010) (per curiam) (holding that trial court's forum-non-conveniens dismissal "was not an abuse of discretion in light of the evidence before it"); *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984) (noting that "the existence of substantial evidence has been equated with fair and reasonable conduct on the part of the agency," while "agency decisions that are unsupported by substantial evidence have been deemed arbitrary and capricious"). This is so regardless of whether TCEQ held an evidentiary hearing, as long as the hearing requestor was afforded its regulatory rights to express his dissatisfaction with the proposed license and the agency did not refuse to consider the evidence offered in support of that dissatisfaction. *See Sierra Club*, No. 03-11-00102-CV, slip. op. at 13 (citing *Bosque River*, 413 S.W.3d at 408 (noting, in its determination of whether TCEQ abused discretion in denying hearing request, that there was "no indication that [TCEQ] refused to consider any evidence tendered to substantiate the[] asserted deficiencies" in requested permit); *City of Waco*, 413 S.W.3d at 423–24 (reversing contrary holding in the underlying opinion while citing with approval *Collins v. Texas Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 884–85 (Tex. App.—Austin 2002, no pet.), that agency's denial of hearing request was supported by substantial evidence regardless of fact that evidentiary hearing not held)).

### *TCEQ's evaluation of Sierra Club's hearing request*

Our review of the record indicates that TCEQ was within its discretion to determine that Sierra Club's members were not affected persons. The record indicates that, upon receipt of Sierra Club's hearing request, the Executive Director set the matter for consideration at a TCEQ meeting, allowed responses, and allowed Sierra Club to file a reply to those responses. In

12

considering the request, TCEQ had before it, among other items, Sierra Club's hearing request, WCS's final application, the draft permit, the draft environmental analysis, public comments, the Executive Director's responses to comments and hearing requests, WCS's and OPIC's responses to hearing requests, and Sierra Club's reply to those responses. The following is a summary of the information contained in these materials.

Sierra Club's first purported "affected person" member, Rose Gardner, owns property four miles west of the proposed facility, in Eunice, New Mexico, where she grows alfalfa and hay and raises horses, cattle, goats, chickens, and a pig that feed on the alfalfa and hay. Sierra Club's hearing request alleged that Gardner's health and property would potentially be affected by WCS's facility in the following ways:

- Negative publicity associated with the radioactive disposal facility will cause economic damage to her two businesses, which rely on travelers from outside Eunice, New Mexico.

- A traffic accident involving toxic or radioactive material destined for the WCS facility would "have the potential to impact her livelihood and health."

- Dispersal of radioactive material from the site to the west would "have the potential to impact her livelihood and health."

- Groundwater contamination from the facility might affect her health and livelihood because the well on her property is "potentially hydrologically connected to groundwater resources" in the vicinity of the site.

- If depleted uranium from the uranium enrichment plant near her home town of Eunice, New Mexico is disposed of at the WCS facility, it would be transported on the same roads that Gardner uses.[11]

- Although railcar transport is not allowed under the terms of the draft license, WCS might later seek to receive waste by rail and, if it does, any accidents involving transportation of

---

[11] WCS emphasizes that disposal of materials from the uranium enrichment plant near Eunice is not authorized under the proposed license.

13

radioactive waste by rail to the WCS facility would affect Gardner because she travels near the railroad that would be used.

- Gardner lives in "the same hydrological basin as the WCS site."

- "High single-direction winds traveling westward from the site have the potential to materially harm" Gardner's property, livelihood, and health if they disperse radioactive material from the site.

- "The very limited financial assurances provided by" WCS would affect her if WCS were to "walk away without providing proper clean-up or closure of the facility."[12]

Sierra Club's request asserted similar adverse effects to its second member representative, Williams, including that she travels along the highways that will be used to transport the radioactive waste, that her home is near a railroad line that would be used to transport radioactive material if that mode of transport is ever allowed, that she uses groundwater in the vicinity of the disposal site, and that she would be exposed to radiation by westerly high winds common in the area.

WCS's application and the draft permit, generally stated, provide that the low-level radioactive waste designated for disposal at the WCS site will arrive at the facility in secure packages or containers in compliance with applicable state and federal laws. The waste disposed of in the Texas–Vermont Compact waste facility will be encased in carbon-steel reinforced concrete canisters placed in an engineered below-ground disposal unit. The waste for the federal-waste facility will be placed in concrete canisters or in compacted one-foot layers of waste in engineered disposal units that are placed below ground. The liner systems underneath each facility will include reinforced concrete barriers, drainage systems, and a compacted clay liner, with sensors placed under the liners to verify that they are working. The liner for the federal-waste facility will also have a double-layer

---

[12] Most of these alleged adverse affects were also offered (and addressed) in the case discussed *supra* note 5.

flexible membrane liner with leak-detection monitoring and leachate-collection systems. The top of all waste at both facilities will be at least five meters below the surface. The top cover for both facilities will consist of a multilayer design of between 25 and 40 feet of composite-cover system with a reinforced concrete barrier, compacted red-bed clay, synthetic membranes, and water drainage and leak detection systems to prevent horizontal or vertical migration of moisture from the facilities.

Regarding surface and groundwater in the vicinity of the proposed facilities, WCS's application shows that the surface water flows not west toward where Gardner and Williams are located, but rather away from them toward the southwest, and that the groundwater in the area likewise flows south/southwest or downgradient of Gardner and Williams. WCS's plan also includes installation of a berm on the uphill side of the landfill and a channel to divert rainwater runoff around the three landfills. According to the application, rain falling within the landfill area will be collected in a bermed area large enough to retain the rainfall from a 100-year, 24-hour storm event. Rain falling in an active cell of the landfill will be captured and removed by the leachate-collection system. WCS's plans also require monitoring of area surface water and installation of groundwater-monitoring wells around the site at differing elevations to provide early detection of any subsurface release of contaminants.

Regarding climate and meteorology, the data in WCS's application indicates that the prevailing winds at the site come from a southerly direction, while winds blow from east to west—i.e., toward Gardner and Williams—only about six percent of the time. Further, neither facility will be allowed to conduct waste operations during windy conditions, and WCS will monitor air particulates.

15

WCS's application also included a performance assessment it had conducted to analyze the potential radiation exposure to workers and the general public during operations and for a thousand years after the facility closes. For the operational period, the performance assessment models the radiological effects of both normal operations and unexpected failures of protective aspects of the design, such as a breach of the liner system or an explosion of a waste container. It examined various pathways for potential releases, including groundwater and dispersal by high winds. According to WCS's assessment, the radiological impact of normal operations on the hypothetical "near resident" was predicted to be less than .0004 percent of the allowable standard of 25 millirems per year, and the impact from worst-case scenarios—i.e., severe winds and tornadic conditions—was less than .002 percent of the allowable standard.[13] For the post-closure period, WCS modeled the impact on a hypothetical resident living adjacent to the landfill who uses groundwater for drinking and livestock watering, and also the impact on an hypothetical "intruder-resident"—i.e., trespasser—living directly above the disposal unit and using water from a well drilled directly through the waste for drinking and livestock watering. The long-term estimates assumed that all engineered systems, such as the liner system, would fail. WCS's modeling predicted an exposure of 3.4 millirems per year for the hypothetical post-closure resident living

---

[13] *See, e.g.*, 10 C.F.R. § 61.41 (Nuclear Regulatory Comm'n, Protection of the general population from releases of radioactivity) ("Concentrations of radioactive material which may be released to the general environment . . . shall not result in an annual dose above background exceeding an equivalent of 25 millirems to the whole body, 75 millirems to the thyroid, or 25 millirems to any other organ of any member of the public."); 30 Tex. Admin. Code § 336.724 (Protection of the General Population from Releases of Radioactivity) (same). According to at least one study, the average American absorbs approximately 300 millirems per year of natural background radiation—i.e., radiation from nature. Health Physics Soc'y, *Radiation Risk in Perspective, Position Statement of the Health Physics Soc'y* (Aug. 2004) at 1 (available at http://hps.org/documents/radiationrisk.pdf).

adjacent to the facility and 4.6 millirems per year for the intruder resident—both significantly lower than the allowable 25 millirems per year.

TCEQ's environmental analysis of WCS's proposed facility, which again is required by statute, consists of a "written analysis of the effect on the environment of a proposed licensed activity that the commission determines has a significant effect on the human environment." Tex. Health & Safety Code § 401.113(a). It is organized by subject area, analyzing the license application materials WCS submitted and the related technical analysis of those materials. It discusses the review and analysis of technical issues in several critical areas and includes:

(1)    an assessment of radiological and nonradiological effects of the activity on the public health;

(2)    an assessment of any effect on a waterway or groundwater resulting from the activity;

(3)    consideration of alternatives to the activities to be conducted under the license; and

(4)    consideration of the long-term effects associated with activities, including decommissioning, decontamination, and reclamation impacts, including the management of low-level radioactive waste, to be conducted under the license.

*Id.* § 401.113(c). Stated very generally, the nearly 400-page environmental analysis of WCS's license operation offers detailed analysis of the application, conclusions regarding whether the proposed facility meets statutory and regulatory requirements, and suggested modifications to the license to achieve compliance with certain regulations.

The Executive Director's responses to comments and hearing requests, which relied on information from the environmental analysis, the draft permit, and WCS's application, recommended that Sierra Club's hearing request be denied because neither Gardner nor Williams is a "person affected" or "affected person" under the TCEQ rules for evaluating hearing requests.

The Executive Director's response instead concludes that Gardner's and Williams's concerns are common to the general public and that Sierra Club failed to show there was "even a plausible risk [Gardner or Williams] would be adversely affected by the regulated activity" because they are "upstream, upgradient, and upwind" from the facility. Regarding the specific affected-person factors that TCEQ must consider in evaluating hearing requests, the Executive Director's response concluded that most weighed against finding that either Gardner or Williams was an affected person. The Executive Director's conclusions can be summarized generally as follows:

- Section 55.256(c)(1)—Gardner's and Williams's "concerns about groundwater and airborne contamination and financial assurance are addressed by the laws under which the application will be considered." "Although concerns about negative publicity, transportation requirements, and the licensing of a nuclear power plant are not addressed by the laws under which the WCS application is reviewed," TCEQ does not regulate the transportation of radioactive materials or the use of roadways in Texas or New Mexico. Transportation of radioactive materials must comply with all applicable state and federal laws and regulations. Further, the draft license prohibits receipt of radioactive material by rail.

- Section 55.256(c)(2)—"[T]here are no established distance restrictions or other limitations imposed by law on an affected interest." Further, Gardner and Williams live and own property more than three miles from the proposed facility.

- Section 55.256(c)(3)—"There is a reasonable relationship between the concern about groundwater and airborne contamination as well as the amount of required financial assurance and the regulation of low-level radioactive waste disposal. However, these concerns are common to all and were addressed in the review of the application and are reflected in the various conditions of the draft license." The draft license requires financial assurance in amounts approved by the Executive Director based on TCEQ rules. Neither Gardner nor Williams is party to any financial assurance requirements and would not be liable for any shortfall.

- Section 55.256(c)(4)—"There is no likely impact of the regulated activity on [Gardner's or Williams's] health, safety and use of property." There is no likely impact from groundwater contamination because the application provided adequate information on the characterization of the geology and hydrology of the proposed site and design. The proposed design calls for excavation below certain relevant formations, and other relevant formations "are not likely conduits of potential contamination from the proposed disposal facilities to groundwater in Eunice" because of separation and direction of groundwater flow. Recommended revisions

18

to draft license regarding buffer zones provided "additional protection of public health and safety and the environment."

- Regarding windborne migration and contamination concerns, the application shows prevailing winds primarily from the south, whereas Gardner and Williams are both due west of the proposed facility. Further, the application's modeling shows that exposure will be well below required limits. Finally, the Executive Director recommended revisions to the draft license to require a particulate emission study to address high-wind events and additional analysis of emissions controls during average and high-wind events.

- Section 55.256(c)(5)—"[T]here is no likely impact of the regulated activity on [Gardner's or Williams's] use of groundwater resources." The likelihood of groundwater contamination and migration of contaminates into a well used by Gardner or Williams is remote given the location of the regional aquifers, groundwater flow and gradients within the regional aquifers, and the design of the facility as required by the draft permit.

The above-described information contained in the administrative record and available to the commissioners—i.e., the Executive Director's response and recommendation, the information contained in its response, the environmental analysis, the draft permit, and WCS's application, among others—supports a conclusion that WCS's application for a low-level radioactive waste disposal license met the statutory requirements for such a facility and that operation of the facility as licensed is not likely to adversely affect the environment in amounts that are prohibited under the law. For that reason, it would have been reasonable, and thus within TCEQ's discretion, to conclude that Gardner and Williams are not affected persons because the licensed activity will have minimal effect on their health, safety, use of property, and use of natural resources. *See* 30 Tex. Admin. Code § 55.256(c)(4)–(5). Likewise, it would have been reasonable for TCEQ to determine that Gardner's and Williams's stated concerns over possible traffic and railway accidents involving low-level radioactive materials were not reasonably related to the disposal of those materials at the WCS site because TCEQ has no jurisdiction over the transportation of radioactive materials and because the permit does not allow WCS to receive radioactive material by rail. *See id.* § 55.256(c)(1),(3).

19

Relatedly, it would have been reasonable for TCEQ to determine that Gardner is not an affected person given that her concern regarding the effects of possible negative publicity on her business is not reasonably related to the WCS facility because the relevant regulations involve public health, safety, and the environment—not publicity. *See id.* Finally we would note, as did the Executive Director, that Gardner's and Williams's concerns about the licensed activity are shared by the general public. *See id.* In sum, we cannot say that TCEQ erred in deciding that neither Gardner nor Williams is a person who would be affected by the proposed permit under the relevant factors. Accordingly, it was within TCEQ's discretion to deny the hearing request, and in fact, it would have been an abuse of TCEQ's discretion to grant the hearing request upon such a determination. *See* Tex. Health & Safety Code § 401.239 (requiring TCEQ to hold contested-case hearing regarding low-level radioactive waste license if requested by person affected). We sustain TCEQ's and WCS's first issue.

**Supplemental Evidence**

Having sustained appellants' first issue on appeal, we need not address their second issue challenging the district court's decision to supplement the administrative record with internal TCEQ memos regarding another type of disposal license and with a third-party affidavit from another case. *See* Tex. R. App. P. 47.1 (requiring opinion be "as brief as practicable but . . . address[ing] every issue raised and necessary to final disposition").

**CONCLUSION**

Having determined that TCEQ's decision to deny Sierra Club's request for a contested-case hearing is supported by the administrative record, we reverse the district court's

20

judgment and render judgment affirming TCEQ's decision to deny the hearing request. *See* Tex. Health & Safety Code § 401.240(b).

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Rendered on Motion for Rehearing

Filed:   December 30, 2014